933 F.2d 616
 59 USLW 2744, Fed. Sec. L. Rep. P 95,926,
19 Fed.R.Serv.3d 1247
 In re CONTROL DATA CORPORATION SECURITIES LITIGATION.
Diane ABBEY, David Weisgal, William Steiner, William
Randall, and John Page, Appellants,
v.
CONTROL DATA CORPORATION, Norbert R. Berg, William C.
Norris, Robert M. Price, Marvin G. Rogers, and
Peat, Marwick, Main & Co., Appellees.
 No. 90-5107.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 15, 1990.
Decided May 10, 1991.
 
 Robert A. Hoffman, Sheldon L. Albert, Philadelphia, Pa., Karl L. Cambronne, Minneapolis, Minn., for appellants.
 Craig W. Gagnon, Minneapolis, Minn., for Control Data.
 Elliott S. Kaplan, Minneapolis, Minn., for Peat, Marwick, Main & Co.
 Before LAY, Chief Judge, FAGG, Circuit Judge, and WRIGHT,* District Judge.
 LAY, Chief Judge.
 
 
 1
 In a class action, plaintiffs represent approximately 10,000 persons who purchased Control Data Corporation stock between January 7 and August 6, 1985. The complaint alleges that Control Data, its officers, and auditor (Peat Marwick) disseminated information misrepresenting the financial health of the company in violation of Section 10(b) of the Securities and Exchange Act of 1934 (Rule 10b-5). The district court[1] directed a verdict for defendants, ruling that the class failed to prove the alleged misrepresentations caused damages to the class. Plaintiffs appeal. We affirm in part, reverse in part, and remand for trial.
 
 I.
 
 2
 Plaintiffs allege Control Data Corporation (CDC) made several public statements that materially misrepresented the company's financial status in violation of Rule 10b-5. On January 4, 1985, CDC issued a press release announcing 1984 earnings at 80 cents a share and expected 1985 earnings at $4 a share. CDC made similar statements in a January 23, 1985, press release and in its 1984 Annual Report and Form 10-K. The Annual Report was very optimistic and projected "substantially increased earnings in 1985." [A.33].
 
 
 3
 Plaintiffs claim that CDC made two accounting decisions that inflated income and made these reported earnings figures higher than CDC's true earnings and projections. They allege that CDC knew its financial health was deteriorating and made these improper accounting maneuvers to avoid public disclosure of its financial problems. The class contends that Peat-Marwick allowed the accounting maneuvers knowing they were improper.[2]
 
 
 4
 In July, 1985, the Securities and Exchange Commission (SEC) informed CDC that the two accounting decisions were improper.[3] 3] After attempting to convince the SEC of the propriety of the accounting decisions, CDC ceased opposition and on August 6, 1985, announced a restatement of its earnings. This restatement had the effect of reducing 1984 earnings by 84%. Control Data's reported net income was reduced from $31.6 million to $5.1 million and per share earnings dropped from $0.81 to $0.12. No significant change in stock price occurred on the day of the restatement, but after the Wall Street Journal reported on August 13, 1985 that reversal of the accounting decisions also meant that CDC had defaulted on its loan covenants, CDC stock immediately dropped $3 per share in high volume. The class argues that, had CDC publicized its true financial condition by not making the accounting maneuvers, the class would not have purchased CDC stock at its inflated value and would not have suffered the $3 per share loss.
 
 
 5
 After four years of discovery, the case went to trial in January, 1990. Plaintiff's case lasted three weeks, and at its end all defendants moved for a directed verdict. The court found sufficient evidence that CDC's accounting procedures were improper, but found no evidence of damages resulting from these violations. In contrast, the court found the losses the class suffered due to the drop in stock price resulted from CDC's failure to disclose its possible loan covenant defaults. The court, however, found no evidence that such disclosure was required. Accordingly, the court directed a verdict for defendants.
 
 II.
 
 6
 Although the text of Rule 10b-5[4] does not directly require proof of scienter, causation, or damages, it is settled that these are essential elements of a Rule 10b-5 claim. See Harris v. Union Elec. Co., 787 F.2d 355, 362 (8th Cir.), cert. denied, 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986).
 
 
 7
 The district court found the class presented a submissible case on all elements except causation. The difficulty in the case arose from the fact that the class premised liability on CDC's misleading income statements, alleging that class members bought CDC stock at inflated prices based on the effect the misrepresentations had on the market price. However, when CDC corrected its error and restated its earnings, nothing significant happened to the stock price. Presumably, if the incorrect income figures inflated CDC's stock price, correcting the earnings figures should have deflated the price, and the amount the stock dropped in price would be the measure of damages. See Harris v. American Inv. Co., 523 F.2d 220, 226-27 (8th Cir.1975) (measure of damages generally is fixed as of the date the investing public becomes aware of the fraud), cert. denied, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1975). Given no drop in price immediately after the restatement, plaintiff's expert on damages, John Torkelson, stated that the restatement of earnings caused no damages.
 
 
 8
 The district court found this testimony fatal to the plaintiff's case. The court, seeking to define the parameters of the case and limit the issues before trial, focused on the restatement of earnings as the basis of liability and understood the case to be a "restatement case". Although the class in its complaint and contention interrogatories alleged that CDC committed a variety of misrepresentations,[5] counsel for the class had acknowledged in a pre-trial hearing that the class would pursue only the misrepresentations resulting from CDC's improper accounting.[6] Thus, the court found that Torkelson's testimony foreclosed recovery on plaintiff's sole theory of liability.
 
 
 9
 A further consideration, however, was that CDC's stock price did drop significantly a week after the restatement, after the Wall Street Journal reported that, as a result of the restatement, CDC was in default on its loan covenants, retroactive to March 31, 1985.[7] The class relied on this drop in the stock price as its measure of damages. The court, however, held that the drop in value of CDC stock was not caused by CDC's restatement of earnings, but instead was due to CDC's failure to disclose the status of its loan covenants. Because the class had not proven that CDC had a duty to disclose the status of its loan covenants, the district court reasoned that damages were not caused by CDC's wrongful conduct.
 
 
 10
 We find the district court's view of causation too narrow under legal principles governing Rule 10b(5) cases. Plaintiffs are not required to meet a strict test of direct causation under Rule 10b-5; they need only show "some causal nexus" between CDC's improper conduct and plaintiff's losses. Union Elec., 787 F.2d at 366; St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 562 F.2d 1040, 1048 (8th Cir.1977), cert. denied, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978). Traditional tests of proximate cause derived from tort principles are very much germane. See, e.g., Marbury Mgmt. Inc. v. Kohn, 629 F.2d 705, 708 (2d Cir.), cert. denied, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980).
 
 
 11
 This is a "fraud on the market" case. In such cases, causation is not premised on any specific transaction between plaintiff and defendant, nor is there required any proof that the plaintiff was even aware that a misrepresentation was made. Causation lies in the fact that the plaintiff relied on the market price of the security as an indicator of the future value of the stock. To the extent that the defendant's misrepresentations artificially altered the price of the stock and defrauded the market, causation is presumed. See Basic Inc. v. Levinson, 485 U.S. 224, 247, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988) ("Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.").
 
 
 12
 A jury could reasonably find that CDC's improper accounting artificially altered the price of CDC stock in a variety of ways. Perhaps most obviously the improper accounting inflated 1984 actual earnings and 1985 projected earnings, figures that investors may have considered important in making investment decisions.[8] However, the improper accounting also altered CDC's true net worth and debt-equity ratio. Plaintiffs' expert testified that these figures are financial indicators that would be important to investors because of what they reveal about the status of CDC's loan covenants.[9]
 
 
 13
 CDC is liable for damages resulting from any reasonable investment actions taken in mistaken reliance on its misrepresentations. Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). The fact that the misrepresented earnings figures did not affect the stock price does not negate the possibility that investors were misled in other ways by the improper accounting maneuvers. Thus, CDC would be liable if its improper accounting concealed the company's net worth and debt-equity ratio and inflated the price of CDC stock by obscuring the company's risk of default on its loan covenants.[10]
 
 
 14
 There is no basis for limiting the class to relief only for damages accruing from the effect CDC's improper accounting had on the reported earnings figures. Although termed a "restatement case" by the district court, the class did nothing to limit its claim solely to damages caused by misrepresented earnings figures. It is difficult in our minds to say that the inflated earnings statement was not inextricably tied to the same improper accounting procedures that concealed the risk of loan default.[11]
 
 
 15
 Determination of whether a misrepresentation would have the effect of defrauding the market and inflating the stock price is a jury question. The trier of fact is uniquely competent to determine materiality, as that inquiry requires "delicate assessments of inferences a [reasonable investor] would draw from a given set of facts." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). The class presented evidence of a sufficient "causal nexus" between CDC's improper accounting and the drop in CDC stock price, so that a reasonable jury could find causation. See Union Elec., 787 F.2d at 366. Accordingly, we find the district court erred in directing a verdict for defendants, and remand the proceeding for a plenary trial.
 
 III.
 A.
 
 16
 The class contests the district court's decision precluding its witness, Mr. Ten Eyck, from testifying that CDC had a duty to disclose in its 1984 Annual Report that the company could not borrow the full amount committed to it under two revolving credit agreements because such action would cause it to default on its loan covenants. The class offered Mr. Ten Eyck's testimony to rebut the testimony of a Peat Marwick officer, who stated he had never seen a company disclose that it was in risk of default on a loan covenant. More significantly, the class intended to use Mr. Ten Eyck's testimony to establish a second basis of liability; that aside from CDC's failure to use proper accounting standards, CDC violated its duty to disclose the status of its loan covenants. The district court excluded the testimony, finding the claim outside the scope of the case.
 
 
 17
 Review of the record indicates that the class had not previously asserted in its complaint or elsewhere that CDC had a duty to disclose its risk of loan default.[12] Thus, the class was attempting to establish a new theory of liability at trial.
 
 
 18
 Rule 16 of the Federal Rules of Civil Procedure imposes a duty on each party to assist the court in defining the issues for trial. Erff v. MarkHon Indus., Inc., 781 F.2d 613, 617 (7th Cir.1986) ("Attorneys at a pre-trial conference must make a full and fair disclosure of their views as to what the real issues at trial will be."). Rule 16(c)(1) directs the parties to formulate and simplify the issues "in the hope of promoting efficiency and conserving judicial resources by identifying the real issues prior to trial, thereby saving time and expense for everyone." Fed.R.Civ.P. 16 advisory committee notes, subd. c (1983).
 
 
 19
 The court established at pre-trial, with the concurrence of the plaintiffs, that the sole theory of liability in the case was based on CDC's alleged misstatements of income. This pre-trial order "controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." Fed.R.Civ.P. 16(e). Consequently, "a party may not offer evidence or advance theories which violate the terms of a pre-trial order." Glismann v. AT & T Technologies, 827 F.2d 262, 267 (8th Cir.1987); see also Hale v. Firestone Tire & Rubber Co., 756 F.2d 1322, 1335 (8th Cir.1985).
 
 
 20
 The class is bound by the pre-trial order and we find no evidence of manifest injustice to justify relief from the order. After four years of discovery, the class should have been fully aware of the viable claims it could pursue. An additional concern is the injustice and prejudice to the defendants, and this court has held that "a pre-trial order will be modified only if there is no substantial injury or prejudice to the opponent." Hale, 756 F.2d at 1335. The defendants rightly claimed prejudice from "surprise" testimony offered on the last day of the plaintiff's case. Although this prejudice might have been relieved by granting a continuance, see Fed.R.Civ.P. 15(b), the district court did not abuse its discretion in excluding the testimony.
 
 IV.
 
 21
 Plaintiff's final claim of error involves the cut-off date for determining damages. When defendants moved for summary judgment the court denied the motions but held that it would consider evidence of damages up to, but no later than, August 13, 1985. [A.192-93] The court reasoned that by August 13 the restatement had been made and "the world knew that there were at least technical defaults in the loan conditions." [A.193] Plaintiffs argued that damages should be measured as of September 20, 1985, the next trading day after CDC cancelled its scheduled public offering of stock and the world knew the full extent of CDC's financial decline. The price of CDC stock dropped significantly on September 20.
 
 
 22
 In securities fraud cases involving publicly traded stock, damages typically are determined as of the date the fraud is discovered. American Inv., 523 F.2d at 225-27. Determining the date the fraud is discovered is a question of fact, but the court may decide the question as a matter of law if there is no valid factual dispute. Holloway v. Pigman, 884 F.2d 365, 366 (8th Cir.1989).
 
 
 23
 The district court stated that it precluded evidence of damages after August 13, 1985, because it had "never understood [the case] to be about the public offering." [A.192] The court correctly observed that any drop in stock price due to the failure of the public offering would not be recoverable as damages, because plaintiffs never sought damages as a result of CDC's failure to successfully complete a public offering. Nor did the class allege that any of the financial disclosures that accompanied the cancellation of the public offering related to its allegations of accounting impropriety. The class claims that financial information disclosed on September 17 relates only to its non-accounting allegations. Appellant's Brief at 44.
 
 
 24
 As noted above, the class originally alleged that, separate from its accounting violations, CDC officers made misleading statements to investors and failed to disclose material information. Prior to trial, however, counsel for the class acknowledged that the case was limited to accounting issues.[13] Thus, the class has effectively conceded that any damages it incurred after August 13 relate only to issues not in the case. To avoid summary judgment, a party must show a factual dispute regarding a viable issue. Holloway, 884 F.2d at 365. We cannot fault the district court for precluding recovery on claims the class had abandoned. The court's ruling limiting proof of damages is affirmed.
 
 
 25
 We remand to the district court for proceedings consistent with this opinion.
 
 
 
 *
 The HONORABLE SUSAN W. WRIGHT, United States District Judge for the Eastern District of Arkansas, sitting by designation
 
 
 [1]
 The Honorable Donald D. Alsop, Chief United States District Judge for the District of Minnesota
 
 
 [2]
 Although Peat-Marwick challenges its liability on the separate ground relating to its duty to disclose known misrepresentations, it does not list the issue of its separate liability in the statement of issues in its brief. Undoubtedly this is because the district court did not address that issue, as it based its decision on the plaintiffs' failure to prove causation. Because a remand is in order we do not address the separate issue of auditor liability, and the parties are free to confront the district court on this issue
 
 
 [3]
 The improper accounting procedures concerned (1) carrying forward a $16.8 million net operating loss tax benefit and (2) charging a $9.7 million loss incurred by an affiliate to retained earnings
 
 
 [4]
 Rule 10b-5 provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase of any security.
 
 
 [17]
 C.F.R. Sec. 240.10b-5 (1987)
 
 
 [5]
 The class sought relief based on Rule 10b-5, common law fraud, and negligent misrepresentation. The Consolidated Complaint emphasized CDC's two improper accounting decisions reflected in the 1984 Annual Report and Form 10-K as the primary misrepresentations. [A.30-32, 41-45] However, the complaint also alleged that CDC officers made misleading optimistic statements about prospects for future earnings and fraudulently increased dividends to perpetuate a falsely rosy financial picture. [A.33-34] CDC allegedly also failed to report substantial losses. [A.34-35] CDC's announcement that it was granted temporary waivers on its revolving credit agreements also was listed as a "substantive allegation". [A.37]
 In answer to contention interrogatories, the class reiterated the liability claims in the complaint and further asserted that the 1984 Annual Report, Form 10-K, and Form 10-Q were misleading as a whole because they failed to represent CDC's true financial condition. [A.50] The class listed 21 specific statements from these documents that allegedly were untrue. [A.50-59] The class also listed statements made by CDC officers at an investment community meeting, alleging that the statements were misleading for failing to disclose, inter alia, that CDC was close to default on its revolving loan covenants. [A.59-62] The class also listed a January 4, 1985 press release as misleading. [A.62]
 
 
 [6]
 The following colloquy took place:
 The Court: [M]y writing or my pretrial order says the gravamen of the plaintiff's complaint concerns alleged misstatements of income contained in the '84 Annual Report, Form 10K, and an interim report for the first half of '85; which correspond in a general way with the Control Data designation of issues ...
 What is your perception as to whether those are in fact the issues in this lawsuit?
 Mr. Cambronne (Plaintiff's Counsel): Your Honor, I am pleased to say that the outline of issues as reflected in the Control Data brief is accurate.
 [A.1279-80]
 
 
 [7]
 CDC was required to maintain minimum levels of net worth and debt-equity ratios under its revolving credit agreements. Using the restated earnings figures, CDC was in violation of its loan covenants as of March 31, 1985. Dist.Ct. Order at 5
 
 
 [8]
 There was testimony in the record, however, suggesting that investors would place little value in "historical" figures of earnings, because investors are concerned only with future performance of the company. Plaintiff's expert Torkelson opined:
 Basically the restatement [of earnings] itself, the numbers are a restatement of the past and would not be interpreted by themselves by a reasonable analyst as affecting the future of the company, and the stock price reflects the future of the company. Instead, the importance of these numbers [is] the fact that by removing these figures from the net worth of the company, the company then fell into a default situation with its lenders which did create an operational problem for the company and is important to an [investment] analyst. So it's the relationship between the company and its lenders that's important to the financial community. And to the extent that [the defendant's concealed] that relationship; that is, the default relationship, through the use of accounting adjustments, that is what is the problem from the point of view of the financial community and the value of the stock.
 [A.1327]; see also [A.416].
 
 
 [9]
 See supra note 8
 
 
 [10]
 The parties dispute whether the plaintiffs need to show that the accounting maneuvers obscured CDC's actual default on its loan covenants or only that the improper accounting concealed CDC's risk of loan default. The crux of the issue is whether the improper conduct artificially affected the market price of the stock. Union Elec., 787 F.2d at 367 n. 9. This depends on whether a reasonable investor might have considered either actual default or the risk of actual default important in the investment decision. Affiliated Ute Citizens, 406 U.S. at 153-54, 92 S.Ct. at 1472. There was expert testimony in the record indicating that disclosure of the risk of loan default would be important to investors. Thus, the plaintiffs should be allowed to test that claim before a jury
 
 
 [11]
 Under Fed.R.Civ.P. 16(e), each party is bound to its statement of issues as reflected in the pre-trial order. Glismann v. AT & T Technologies, Inc., 827 F.2d 262, 267 (8th Cir.1987). Although the class stated at a pre-trial hearing that its case was limited to the accounting issues in the 1984 Annual Report, Form 10-K and 1985 interim report, there is no suggestion in the record that the case was limited only to the accounting issues as they affected the earnings figures. Plaintiff's counsel agreed with the district court's statement that "the gravamen of the plaintiff's complaint concerns alleged misstatements of income." [A.1279-80] However, income and earnings are not synonymous. By stating that the case was limited to CDC's misstatement of income, the class did not signify that its case was limited only to the effects of the misstated income as it affected earnings. Thus, the class was free to show that the misstatements of income affected CDC's stated net worth and debt-equity ratio as well as its reported earnings figures
 
 
 [12]
 The class did refer to CDC's risk of loan defaults in its contention interrogatories, in which it alleged that CDC officials made misleading statements at investment meetings concerning the general financial health of the company. [A.60] However, the class never asserted a separate duty to disclose the loan defaults, and it did not pursue the alleged oral misrepresentations at trial
 
 
 [13]
 See supra note 6