Lewis D. JACOBS and Stuart J. Jacobs, Appellants,

v.

Robert PIERCE, Appellee.

In re Robert PIERCE, Debtor.

Lewis D. JACOBS and Stuart J. Jacobs, Creditors,

v.

Robert PIERCE, Debtor.

No. 89–13609.
Bankruptcy Appeal Civ. A.
No. 93–12176–REK.

Adv. No. 92–1440–WCH.
United States District Court,
D. Massachusetts.

June 20, 1994.

Gregory C. Howard, Boston, MA, for Lewis D. Jacobs, Stuart J. Jacobs.

John T. Lamond, Hart and Lamond, Lowell, MA, for Robert Pierce.

**Opinion**

KEETON, District Judge.

**I.**

This case is on appeal from the bankruptcy court's dismissal of Lewis and Stuart Jacobs' complaint seeking a determination that Robert Pierce's debt to them of $400,000 is non-dischargable. As noted by the bankruptcy court, this proceeding has been "unnecessarily murky." For the reasons stated below, the decision of the bankruptcy court is vacated and the case is remanded for further proceedings consistent with this Opinion.

**II. Factual Background**

With the exceptions noted, the statements that follow do not appear to be in dispute. The statements of interpretation of the meaning of legal documents are this court's conclusions of law.

**A. Herman Jacobs and his Family**

Herman Jacobs was a certified public accountant. Lewis and Stuart, two sons by a previous marriage, are creditors in this action. Herman's second wife, who is not the mother of Lewis or Stewart, was Kathryn Jacobs. The allegations of defalcations in this action are related to various provisions Herman made for Kathryn, Lewis, and Stuart in his will and in several trust instru-

ments. There are no claims in this action that relate to any provisions Herman may have made regarding any other family members.

Herman created the Jacobs Family Trust ("the JFT"), in 1975, amending it in 1983.

On October 27, 1987, Herman executed four documents, each of which was prepared by Robert Pierce, the debtor in this action:

(1) Herman's will (Exhibit 17);

(2) the Herman Jacobs QTIP Trust ("QTIP");

(3) the Herman Jacobs Family Trust ("HJFT") (Exhibit 19) (not to be confused with the Jacobs Family Trust, or "JFT"); and

(4) a deed from the JFT to Herman and Kathryn of the family residence (Exhibit 20);

Herman died on February 23, 1988. He was survived by Kathryn, Lewis, and Stuart.

Kathryn remarried in 1990.

## B. The Jacobs Family Trust ("JFT")

As stated above, Herman created the JFT in 1975 and amended it in 1983. *See* Exhibit 12.

Under the terms of the trust, as last amended, Herman was the sole trustee. His brother David was designated to succeed Herman as trustee upon Herman's death.

The trust provided for the payment of annual income to Kathryn commencing upon the death of Herman. Upon the death of the survivor of Herman and Kathryn, or upon Kathryn's remarriage, should she be the survivor, the trust would terminate and the assets be distributed to Lewis and Stuart.

In the event of Kathryn's remarriage—which, as noted above, occurred in 1990—the principal and income of the trust were to be "divided and distributed ... to LEWIS D. JACOBS—TWO–THIRDS SHARE and STUART J. JACOBS—ONE THIRD SHARE."

After Herman's death, Pierce met with Kathryn, Stuart, and Lewis, at times together, at times separately. He also met separately with David. Pierce drafted an agreement to terminate the JFT, which was signed by Lewis, Stuart, Kathryn, and David, effective on or about March 24, 1988.

Before submitting the draft agreement to Lewis and Stuart, Pierce had not provided them with any copies of previous drafts, nor with copies of the Stock Agreement, the QTIP, the JFT, the HJFT, or the will.

## C. P & M Associates, Inc. ("P & M")

P & M Associates, Inc. ("P & M"), was a corporation in the business of lending money secured by mortgages.

In 1987, the four stockholders of P & M (Pierce, Herman, Matthew Fisher, and Harvey Madoff) executed a stock agreement. It provided that upon the death of a shareholder, P & M would buy back that shareholder's stock. Exhibit 14. The agreement provided that P & M would finance the stock buy-back by taking out life insurance policies—one on the life of each of the shareholders. The precise terms of this agreement—the interpretation of which is disputed—are discussed in more detail below.

The parties stipulated before trial that Pierce "drafted and caused [the stock agreement] to be executed."

At the time of Herman's death, Herman held his share of P & M stock as trustee for JFT. Under the buy-back terms of the stock agreement, the price to be paid by P & M for the stock was $400,000. The meaning of the agreement as to the identity of the buy-back payee is in dispute and is considered below in Part IV.B.

At the time of Herman's death, the four stockholders of P & M were Herman, as trustee of the JFT, Pierce, Fisher, and Madoff.

P & M filed for bankruptcy in 1989. *See* Bankruptcy Case No. 89–12612–HAL.

## D. Herman Jacob's Will

As stated above, Herman executed his will on October 27, 1987.

The will named Robert Pierce as executor. He was appointed temporary executor on March 23, 1988. When the will was allowed, on April 29, 1988, Pierce was appointed permanent executor.

According to the terms of the will (Article XII), HJFT was to receive "the maximum amount which can be absorbed by the unified credit and the Commonwealth of Massachusetts death tax credit." The parties agree that the relevant amount, for the dates in question, was $642,420. The QTIP was to receive the residue (Article XIII).

### E. The Herman Jacobs Family Trust ("HJFT")

As stated above, the HJFT was created by Herman on October 27, 1987.

Pierce was named as, and has until now served as, the sole trustee of the HJFT.

Lewis and Stuart were the primary beneficiaries. The HJFT provided that after the death of Herman, the trust would terminate and the principal and income would be distributed "in equal shares" to Lewis and Stuart.

As stated above, the will provided that the HJFT was to receive "the maximum amount which can be absorbed by the unified credit and the Commonwealth of Massachusetts death tax credit," an amount the parties agree was $642,420. In fact, however, the HJFT has never been funded.

### F. The QTIP Trust

As stated above, the QTIP Trust was created by Herman on October 27, 1987.

Pierce and Kathryn were named as, and have until now served as, co-trustees of the QTIP.

Under the terms of the QTIP, the trustees must pay the net income to Kathryn at least annually, and are empowered to distribute the principal to her in their "uncontrolled discretion."

The QTIP trust does not have a disqualification upon remarriage.

Upon Kathryn's death (which has not yet occurred), the QTIP terminates, with one half of its assets to be divided equally between Lewis and Stuart, and the remainder payable to seven charities.

So far as the record discloses, the only asset of the QTIP is a $300,000 debenture issued by P & M; see discussion below at II.H.

### G. Robert Pierce

Robert Pierce, the debtor, is an attorney licensed to practice in Massachusetts. As stated above, at all times relevant to this action Pierce was:

(1) an officer, director, and stockholder of P & M;

(2) co-trustee, with Kathryn, of the QTIP;

(3) executor of Herman's estate; and

(4) sole trustee of the HJFT.

At no time was Pierce a trustee of the JFT.

### H. The Chain of Events at Issue in this Case

As stated above, Herman died on February 23, 1988.

On March 8, 1988, David Jacobs, who had just succeeded Herman as trustee of the JFT upon Herman's death, assigned the shares held by JFT to P & M.

As stated above, the parties have stipulated that the purchase price of the stock held by Herman Jacobs on his death was $400,000.

P & M received $405,216 in proceeds from life insurance on Herman, in the form of two checks in roughly equal amounts, on March 23, 1988, and June 10, 1988.

The Stock Agreement stated that "[i]n the event the insurance proceeds exceed the purchase price, such excess shall be retained by the Corporation."

On April 15, 1988, P & M issued checks to the Internal Revenue Service in the amount of $100,000, and to the Commonwealth of Massachusetts in the amount of $18,750, both bearing memo notations "Estate of Herman Jacobs."

On April 19, 1988, Pierce, as temporary executor of the estate, acknowledged a loan from P & M in the amount of $119,000 bearing interest of 1% per month.

On August 29, 1988, P & M issued two checks, totaling $400,000 to "David Jacobs Trustee of the Jacobs Family Trust and to the Estate of Herman Jacobs." The checks were marked "[f]or deposit only P & M Associates, Inc. 390–018–5 Payment in full settlement for capital stock in Company,"

and were endorsed by David as trustee of JFT and by Pierce as executor of the estate.

P & M issued a $300,000 subordinated P & M debenture to the QTIP trust at this time. Exhibit 24. (Apparently, $100,000 was deducted for the $119,000 loan; the discrepancy between the two figures is not explained.)

### III.  Procedural Matters

#### A.  Procedural Background

In the proceeding before the bankruptcy court, Lewis and Stuart contended that Pierce had harmed them in the amount of $400,000 by committing breaches of various fiduciary duties that he owed to them, that such breaches constituted a "defalcation" under 11 U.S.C. § 523(a)(4), and thus that the debt of $400,000 is not dischargeable.

The bankruptcy court ordered the parties to submit a pretrial statement regarding the facts upon which the parties agreed, the facts that were in dispute, and the legal issues that the court had to decide. At trial, the pretrial statement, affidavit and deposition testimony were received in evidence. Only one witness, whose testimony is not relevant here, was cross-examined. The judge then issued written findings and conclusions of law, and dismissed the complaint. Lewis and Stuart appealed.

■ This court heard oral argument on the matter on February 16, 1994, and ordered rebriefing regarding the standard of review to be applied.

#### B.  Standard of Review

Fed.R.Bankr.P. 8013 provides that on appeal,

[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses.

In rebriefing the issue, appellants have apparently dropped their contention that because the proceedings in the bankruptcy court were based almost entirely on documentary evidence, the bankruptcy court's decision was, in essence, summary judgment, and thus subject to review *de novo*. In any event that contention is without merit. The proceeding in the bankruptcy court was a trial in a core proceeding. Thus, to the extent that the bankruptcy court found facts, they are to be reviewed for clear error. It may be somewhat easier to determine that a factual finding is clearly erroneous, where it was rendered solely on documentary evidence and the lower court therefore had no greater opportunity to determine the credibility of witnesses than the reviewing court. Nevertheless, to overturn the bankruptcy court's decision, the reviewing court must still find clear error.

*See, e.g., In re Tully,* 818 F.2d 106, 108–9 (1st Cir.1987) (standard of review to be applied under Rule 8013 is no different in cases in which there were no witnesses at trial, despite explicit reference in rule to bankruptcy court's opportunity to judge credibility of witnesses).

Appellants maintain that the bankruptcy court did commit clear error, in that it found facts that were contrary to the agreed statement of facts submitted by the parties under the pretrial order.

Upon closer examination, however, this court has determined that some of the "facts" stipulated to by the parties are not facts. Instead, they are in essence legal conclusions in the nature of interpretation of legal documents, including the will and the stock agreement.

■ The interpretation of such documents—absent any genuine dispute as to the underlying facts, and absent any ambiguity that can only be resolved by reference to extrinsic evidence—is a matter of law. Neither of the parties contends that the documents in question are ambiguous and can only be resolved by reference to extrinsic evidence. Furthermore, although the parties dispute some of the background facts in this case, such as the circumstances associated with the drafting of documents, including alleged misrepresentations, the parties have not identified any factual dispute raised in this proceeding that is relevant to the interpretation and application of the terms of these documents to the disputes raised in this proceeding. Thus, to the extent that the

pretrial statement of agreed facts purports to determine the law of this case, the statement cannot be controlling. This court must review *de novo* the issues of law bearing upon the interpretation of the documents.

■ *In re Control Data Corp. Securities Litigation,* 933 F.2d 616 (8th Cir.1991), cited by creditors, is not to the contrary. In that case, the court noted that Rule 16 "imposes a duty on each party to assist the court in defining the issues for trial" and that once a pre-trial order has been entered, "a party may not offer evidence or advance theories which violate the terms" of the order. *Id.* at 621 (citations and internal quotations omitted). This means only that *a party,* having narrowed the issues by means of such a pretrial order, is precluded from later raising arguments inconsistent with that agreement. The case does not stand for the proposition that the parties, by means of such an issue-narrowing agreement, can bind *the court,* directly or indirectly, to an erroneous conclusion of law.

## IV. The Alleged Defalcations

### A. Clarification of the Claimed Defalcations

■ A debt for "defalcation while acting in a fiduciary capacity" is not dischargeable. 11 U.S.C. § 523(a)(4). In the bankruptcy context, the meaning of the term "defalcation" is not necessarily limited to intentional wrongs. Courts may, for example, find defalcation where there was willful neglect of a fiduciary duty. *See, e.g., Matter of Moreno,* 892 F.2d 417, 421 (5th Cir.1990) (internal citations omitted).

■ In the context of bankruptcy, "fiduciary" has a narrower meaning than in other contexts. It includes only those relationships that existed before, and without reference to, the act asserted to be a defalcation. In other words, although in some legal contexts, the commission of a wrongful act may itself create a fiduciary relationship—sometimes called a "constructive trust"—the commission of such an act is not considered a "defalcation *while acting* in a fiduciary capacity" under the bankruptcy statute (emphasis added).

*See* 2 David G. Epstein, *et al., Bankruptcy* § 7–28 at 367–68 (1992).

The creditors contend that Pierce committed two separate defalcations.

The first defalcation, they contend, is that Pierce wrongfully induced Lewis and Stuart Jacobs to agree to the termination of the JFT. The contention runs roughly as follows. Pierce is alleged to have induced Lewis and Stuart to terminate the JFT by representing to them that terminating the JFT could avoid substantial taxes on the estate, without in any way diminishing Lewis's and Stuart's inheritance. But for the termination of the JFT (the theory goes), the JFT would have received $400,000 in cash for the buy-back of the stock in P & M, and Lewis and Stuart, as beneficiaries of the JFT, would have received those funds.

The second defalcation alleged is that, as executor, Pierce failed to fund the HJFT, as was required by the terms of the will. Instead, the funds went to the QTIP. Since Lewis and Stuart have only a residuary interest in the QTIP, and were the primary beneficiaries of the HJFT, this failure had the effect of denying them access to the funds.

It is important to understand that the two alleged defalcations relate to the same funds. The creditors' complaint essentially involves two alternative claims, that is, two alternative arguments as to how Pierce came to owe Lewis and Stuart up to $400,000. The alternative arguments correspond to the creditors' different capacities. To the extent that Pierce owes creditors for a defalcation regarding the dissolution of the JFT, it is a debt to Lewis and Stuart as beneficiaries of the JFT. To the extent that he owes creditors for a defalcation with regard to the administration of the estate, it is a debt to Lewis and Stuart as beneficiaries of the HJFT, which was a legatee.

These distinctions are important because there can be no breach of fiduciary duty in the abstract; this court must separately analyze *each* fiduciary duty that Pierce is said to have owed to identified creditors, in *each* of the different capacities of those creditors, to

determine whether the debt to identified creditors resulted from a defalcation.

Furthermore, the distinctions are important in this case because Lewis and Stuart are treated differently under the terms of the two trusts. Under the terms of the JFT, upon Kathryn's remarriage (which has occurred), Lewis was to receive two-thirds share, and Stuart one-third share, of the principal and income. Under the terms of the HJFT, the two brothers would receive equal shares. Since after a declaration of nondischargeability, if one is made, each of the brothers will be free to pursue his individual claims against Pierce, it is important for the bankruptcy court to be clear whether, and how much of, each of the alternative claims has been discharged in bankruptcy. Furthermore, as explained below in part IV.B, the fact that Lewis and Stuart stood to gain differently under the different trusts may well have a bearing on the factual determination whether a defalcation occurred at all, and as to the amount of damages sustained.

### B. Pierce's Alleged Violation of a Fiduciary Duty to the JFT

At the conclusion of its Memorandum Decision, the bankruptcy court stated:

Assuming without deciding that Pierce is a fiduciary with regard to the plaintiffs, they have completely failed to demonstrate any action or inaction on the part of Pierce which could be even remotely construed as fraud or defalcation.

Memorandum Decision, Adversary Proceeding No. 92–1440–WCH, August 12, 1993 (hereinafter, "Decision"), at 6. To what extent, if at all, does the quoted statement constitute a finding of fact?

With regard to the creditors' contention that Pierce violated a fiduciary duty to the JFT, the bankruptcy court determined that there was no defalcation. But the bankruptcy court made no findings regarding the appropriateness of Pierce's involvement in the termination of the JFT. Instead, the bankruptcy court relied on a legal determination that under the terms of the Stock Agreement the $400,000 should have been paid into the estate and not to the JFT. *Id.* at 4–5. The court reasoned that since the JFT was

never entitled to the payment for the stock, Pierce's alleged misconduct in regard to the dissolution of the JFT could not have caused a loss to Stuart and Lewis of the value of that payment. *Id.*

The creditors contend that this determination is "clearly erroneous" in that it is at variance with the joint pretrial statement, in which the parties agreed that on March 8, 1988, when David Jacobs, as successor trustee, assigned the JFT's stock to P & M, "P & M owed the [JFT] $400,000."

In some circumstances a court might hold that a stipulation as to the existence of a debt establishes that debt. Here, however, the court had received in evidence the legal document that either would or would not establish such a debt, depending on how it was interpreted. Thus it was entirely appropriate for the bankruptcy court in this case to treat the question whether P & M owed the $400,000 to the estate or instead to the JFT as a question of law. For the reasons stated above, the joint pretrial statement did not bind the bankruptcy court on questions of law.

■ The creditors also argue, however, and with some force, that the bankruptcy court's interpretation of the Stock Agreement is incorrect as a matter of law. Reviewing the Stock Agreement *de novo*, I conclude that the bankruptcy court erred in holding that the JFT was not entitled to payment of the $400,000.

It is true, as the bankruptcy court noted, that the Stock Agreement contained a clause stating that "the purchase price for the stock of the decedent shall be paid to the estate of the decedent as follows...." (¶ 5). Taken by itself, that clause authorizes payment to the estate. But the agreement as a whole cannot be taken to authorize payment to the estate in every instance. Rather, the agreement contemplated payments to family trusts in some circumstances, including those present in this case.

The first page of the Agreement, on two separate occasions, listed the parties to the agreement. Herman was listed as "HERMAN JACOBS, TRUSTEE OF THE JA-

COBS FAMILY TRUST," whereas the other three stockholders were listed in their individual capacities. The line where Herman signed the agreement was similarly marked.

Paragraph 11 of the Agreement stated:

Further notwithstanding anything herein contained to the contrary, Corporation and Stockholders hereby agree that Stockholders may transfer the stock in Corporation which they own to a trust for the benefit of their wives and/or children and in the event said stock is transferred to such a trust, then the trustee of such trust must sign a document acknowledging that the receipt of such stock transferred by the Stockholder is subject to the terms and provisions of the Agreement and that the trustee of such trust shall be bound by all of the terms and provisions of this agreement as though such trustee was an original party to this Agreement. Such trustee shall have the same responsibilities and obligations as the legal representative and/or estate of such Stockholder if and when such Stockholder becomes deceased.

Exhibit 14.

This provision, particularly since it begins "notwithstanding anything herein contained to the contrary," manifests an overarching intention to allow any shareholder to substitute a family trust for himself and his estate. The provision did not, however, explicitly state that the trust would succeed to the *rights* of the shareholder or the estate; it only said that it would succeed to *the responsibilities and obligations.*

The agreement must be read, however, as implying that rights, as well as obligations, are to be transferred. Any other reading is inconsistent with the manifested intent of the parties to allow stock to be placed in family trusts. It would make no sense for an individual to transfer stock to a trust for the benefit of one's family, if, upon one's death, the trust would be forced to disgorge the stock in favor of the estate.

Reading the agreement as allowing payment to the trust, in return for the trust's surrender of the stock, is supported when one examines more closely the clause (Paragraph 5) cited by the bankruptcy court as

authorizing payment only to the estate. That was a clause (titled "payment of purchase price") that specified that payment was to be made in cash, except under certain conditions. See discussion below at IV.C.4. Thus the emphasis was not on the party to whom payment would be made, but rather the manner in which payment would be made. That paragraph 5 specifically referred to "pa[yment] to the estate," without mentioning payment to trusts, does not mean that payment would always be to estates, because, as noted above, paragraph 11 is reasonably read as providing that "notwithstanding anything herein contained to the contrary," all the provisions of the agreement that apply to an estate apply to a trust as well, if the trust holds the stock in accordance with the terms of the Stock Agreement.

This court reverses the legal determination of the bankruptcy court that the agreement authorized payment only to the estate. This ruling, in itself, does not determine whether there was a defalcation in regard to the JFT. As noted, the bankruptcy court did not reach the question whether Pierce's conduct involving the termination of the JFT was appropriate.

Creditors contend that the record supports a finding that Pierce committed a defalcation with regard to the JFT. The basis of this contention must be examined closely, however. Creditors have tended, throughout their briefs, to conflate the various ways in which Pierce was a fiduciary in relation to them, and the various ways in which he may have violated his fiduciary duties. As stated before, because this case involves *alternative* claims of defalcation, one must carefully sort out the different capacities in which the creditors stood to receive the funds of up to $400,000.

Furthermore, the creditors apparently assume that any action taken by P & M can be charged to Pierce individually, without pointing to any clear legal theory that would justify a finding that Pierce is personally liable for the acts or omissions of the corporation.

*See, e.g.,* Complaint at ¶ 18 ("Under the terms of the Jacobs Trust, the $400,00 in

proceeds from the P & M stock redemption should have been held by the Jacobs Trust for the benefit of Kathryn, Lewis, and Stuart. *If Pierce had paid the $400,-000 it would have left his control....*") (emphasis added); *id.* at ¶24 ("Pierce fraudulently induced Lewis and Stuart to terminate the Jacobs Trust, *and keep* the cash insurance proceeds *in his company P & M*") (emphasis added).

That Pierce is a shareholder in P & M does not in itself render him liable for the acts of P & M. Creditors have made a variety of references as to how Pierce stood to gain personally from the transactions at issue here.

See, e.g., Complaint at ¶21 ("Pierce took substantial directors fees from P & M during this period of time. Pierce either directly or indirectly caused attorney fees to be paid by P & M to himself or his law firm as a result of his fraudulent termination of the Jacobs Trust.")

These allegations are insufficient to justify disregarding corporate entity. Once the existence of that entity is noted, it may also be relevant that P & M is the debtor in a related bankruptcy action.

That Pierce drafted the Stock Agreement does not render him liable for the acts or omissions of P & M in regard to the agreement. *Beatty v. NP Corp.*, 31 Mass.App. 606, 581 N.E.2d 1311 (1991), cited by creditors, stands for the proposition that when a lawyer is a party to a contract, which the lawyer drafted, the general principle that a document will be construed against the party that drafted the document applies with special force. *Id.* 581 N.E.2d at 1315. In the present case, it is true, Pierce was a party to the Stock Agreement. Unlike *Beatty*, however, Pierce's status as a party to that agreement is not implicated in the alleged defalcation here, which involves payments that one party (P & M) was required to, but did not, make to another party (the JFT). Pierce's status as a party to the Stock Agreement was as another individual stockholder, with an interest adverse to P & M for purposes of the agreement. This hardly supports finding him liable for the breach *by P & M* of its duties under that contract to another individual shareholder, the JFT.

The creditors also rely on an assertion that Pierce violated a fiduciary obligation to them as executor of the will, and as their lawyer. Insofar as creditors urge that Pierce's actions in regard to the dissolution of the JFT violated his duties as executor, the claim must fail. Any breach of Pierce's fiduciary duties to the creditors *in his capacity as executor*, or as trustee of the HJFT, does not implicate the harm to creditors *as beneficiaries of the JFT*. Indeed, insofar as P & M determined to pay the $400,000 to the estate as opposed to the JFT, this was a decision that tended to *benefit* Lewis and Stuart in their capacity as beneficiaries of the estate. It is important to distinguish the claim that, *as executor*, Pierce violated his duties by helping terminate the JFT, from the claim that, as executor, he violated his duties by failing to fund the *HJFT* (a matter discussed below in part IV.C).

The only contention made by the creditors in regard to the termination of the JFT that might support a finding of defalcation by Pierce is the contention that, in drafting the termination agreement, Pierce was acting as attorney for Stuart and Lewis, or as attorney for the JFT. *See* Stuart Affidavit, ¶14, Lewis Affidavit, ¶8.

Whether Pierce was acting in the capacity of lawyer to the JFT or to Stuart and Lewis individually involves questions of fact. *DeVaux v. American Home Assurance Co.*, 387 Mass. 814, 816–17, 444 N.E.2d 355, 357 (1983). In determining these questions, a court need not find an explicit contractual arrangement that Pierce serve in that capacity; an arrangement may be inferred from the particular circumstances of each case. In *DeVaux*, for example, the Supreme Judicial Court ruled that there was a genuine factual dispute as to the existence of an attorney-client relationship where a person had consulted a lawyer's secretary for advice on a slip-and-fall case, had taken certain actions in preparation for litigation, and on the advice of the secretary had sent a letter to the attorney asking him to represent her, which letter the secretary had misfiled. *Id.*

The bankruptcy court has not rendered a finding as to whether Pierce was acting as attorney for Lewis, Stuart, or the JFT. One need not infer from the fact that he drafted the agreement that Pierce was acting as lawyer for the JFT or for Lewis and/or Stuart individually. Even if Pierce did nothing to signal that he was acting as an adverse party, such as to advise them to retain another lawyer to review the document, it might still be a permissible inference that the parties reasonably interpreted Pierce's manifestations to them, by words and conduct, as meaning that Pierce drafted the agreement solely in his role as executor of the estate.

Even if on remand the bankruptcy court finds that Pierce was acting as attorney for Lewis and Stuart, or as attorney for the JFT, that finding alone will not be sufficient to determine that a defalcation has taken place. The bankruptcy court would also need to consider whether Pierce's conduct regarding the termination of the JFT, by hypothesis in his capacity as attorney to Lewis and/or Stuart and/or the JFT, involved a breach of his duties as lawyer—that is, that he failed to "exercise the skill and knowledge" required of a member of the legal profession. *See* Restatement of Torts 2d., § 299A; *see also* Comment b ("[This section] applies to ... attorney[s]").

Again, it is important to separate Pierce's actions relating to the termination of the JFT from his later actions, as executor, in failing to fund the HJFT. The bankruptcy court must focus on the termination of the JFT and consider the differences between the positions of the two brothers.

With regard to Stuart, the record appears to indicate—although this is a question the bankruptcy court may consider on remand—that the termination of the JFT tended to benefit him. In other words, leaving aside the second defalcation by Pierce, the termination of the JFT would have had the effect of causing the $400,000 to go to the estate, funding the HJFT, which by its terms was to be divided evenly between the brothers. This state of affairs would have been a decided improvement for Stuart, who only stood to gain one-third of the $400,000 if it had been paid to the JFT.

Similarly, the termination of the JFT would appear to have injured Lewis, who stood to gain two-thirds of the $400,000 under the terms of the JFT, but who, absent the second defalcation, would have received only one-half of the $400,000 through the HJFT.

It is entirely possible, then, on the evidence in the record, that the bankruptcy court may find Pierce to have been acting in the capacity of lawyer to Lewis and Stuart, and that there was, in that capacity, a defalcation only with regard to Lewis, causing harm in the amount of the difference between what he stood to gain under the HJFT and the JFT.

## C. The Alleged Breach of Fiduciary Duty as Executor and/or as Trustee of the HJFT

### 1. The Nature of the Issue

The second allegation of defalcation is that Pierce failed, as executor of the estate and as trustee of the HJFT, to see that the HJFT was funded according to the terms of the will. The question may be understood as breaking down into at least three separate issues. One is whether Pierce can be charged with having approved the payment by P & M to the QTIP as opposed to the HJFT. Another is whether Pierce was obliged to fund the HJFT with whatever funds the estate had. Another is whether, if Pierce can be charged with having approved the payment, it was appropriate to accept a debenture on behalf of the estate as opposed to cash.

The creditor's allegation is in the alternative; that is to say it relates to the same funds that are the subject of the first allegation. For purposes of clarity, I will assume in the discussion that follows that the dissolution of the JFT was proper. To the extent, however, that the bankruptcy court determines that the dissolution of the JFT involved a defalcation to either Stuart or Lewis, the amount owed as a result of that defalcation must be offset against the amount owed because of this second defalcation, if one is found.

## 2. Can Pierce, in his Capacity as Executor, be Charged with Approving the Delivery of the $300,000 Debenture to the QTIP?

The bankruptcy court appears to have determined implicitly that Pierce was responsible for P & M's delivery of the $300,000 debenture to the QTIP. Decision at 5 ("Pierce's action in making the Debenture payable directly to the QTIP Trust simply cut short the paperwork by eliminating transfers into and out of the estate."). Pierce signed the debenture, in his capacity as shareholder, as did the other two shareholders. As noted above, Pierce is not personally liable for the acts of the corporation. With regard to the payment to the estate, however, his signature on the debenture indicates that he was aware of the arrangement. It is a reasonable inference, then, that Pierce, in his capacity as executor, at a minimum acquiesced in the payment to the QTIP.

## 3. Was Pierce, as Executor, Authorized to Approve Payment to the QTIP before the HJFT was funded?

Whether Pierce as executor had an obligation to fund the HJFT is a question of law that may be determined by examining the terms of the will.

As stated above, Article XII of the will provided that the HJFT was to receive the maximum amount that can be absorbed by the unified credit and the Massachusetts death tax credit, an amount that the parties stipulate was $642,420. Under Article XIII, the QTIP was to receive the residue.

The bankruptcy court seems to have assumed, without fully explaining, that it was appropriate to fund the QTIP before the HJFT was funded.

> Herman's will provided that the residue of the estate be paid to the QTIP Trust.... Article XIII. Thus Pierce's action in making the Debenture payable directly to the QTIP simply cut short the paperwork by eliminating transfers into and out of the estate. It was appropriate.

Decision at 5. The terms of the will indicate that Pierce as executor had an obligation to fund the HJFT before funding the QTIP.

Thus by funding the QTIP instead, Pierce may have violated his duties as executor.

## 4. Was Pierce, as Executor, Authorized to Accept a Debenture in Place of Cash?

■ The bankruptcy court seems to have interpreted the Stock Agreement to have authorized payment to the estate in the form of the debenture. The court stated:

> Under the terms of the Stock Agreement, notwithstanding the insurance proceeds to be received, the purchase price was to be ˙ "evidenced by a negotiable promissory note made by [P & M] to the order of the estate of the decedent providing for interest at the rate of eight (8%) per annum...."

Decision at 2–3 (internal citations omitted). The court was quoting from paragraph 5 of the Agreement, discussed above in part IV.B.

It appears that in citing the passage from paragraph 5 as quoted above, the court overlooked or disregarded other clauses of the paragraph. Paragraph 5 begins by stating that the purchase price shall be paid to the estate

> as follows: Four Hundred Thousand ($400,000.00) Dollars *in cash* or the entire purchase price *in cash if* the purchase price is *less* than $400,000.00.

Agreement, ¶ 5 (emphasis added). The agreement goes on to provide that

> *In the event that the purchase price is in excess of $400,000.00* said excess over $400,000.00 shall first be paid from any and all proceeds from the policies insuring the life of the decedent ... and *in the event* the purchase price is ... also in in excess of all of the proceeds of the policies ..., *then* the said balance of purchase price over and above [the proceeds] shall be paid in twelve (12) equal consecutive monthly payments beginning one month after the date of the death of the decedent. The *unpaid balance* of the puchase [sic] price shall be evidenced by a negotiable promissory note ... [at 8%].

*Id.* (emphasis added). Thus the conclusion of the bankruptcy court that payment in the form of a promissory note was authorized by the Stock Agreement is incorrect. The passages just cited make clear that such payment by promissory note was only authorized

in the event that, and to the extent that, the payment exceeded $400,000 and exceeded the proceeds from the insurance policies on the life of the deceased. Those conditions were not present in this case.

### V. Order

For the reasons stated above, the Clerk is directed to enter on a separate document the following order:

For the reasons stated in the opinion and order of this date, the decision of the United States Bankruptcy Court for the District of Massachusetts is vacated and the case is remanded for further proceedings.