**Lewis D. JACOBS and Stuart J. Jacobs, Appellants,**

v.

**Robert PIERCE, Appellee.**

**In re Robert PIERCE, Debtor.**

**Lewis D. JACOBS and Stuart J. Jacobs, Creditors,**

v.

**Robert PIERCE, Defendant.**

**Civil Action No. 95–12557–REK. No. BK 89–13609–CJK. Adversary No. 92–1440.**

United States District Court, D. Massachusetts.

April 29, 1997.

---

Gregory C. Howard, Boston, MA, for appellants.

John T. Lamond, Hart & Lamond, Lowell, MA, for Robert Pierce.

## OPINION

KEETON, District Judge.

*What additional elements must a creditor of an attorney-debtor in bankruptcy prove to establish that the attorney's pre-petition breach of a fiduciary duty, by nondisclosure of conflict of interests, constitutes a "defalca-*

tion" under 11 U.S.C. § 523(a)(4) and that as a result a debt (of at least $400,000) is not dischargeable?

*Is the law governing lawyers, bearing on the response of a lawyer in Massachusetts to conflict of interests, relevant to whether the lawyer's debt to a former client or prospective client is nondischargeable as a "defalcation in a fiduciary capacity" of the lawyer-debtor in bankruptcy proceedings?*

*Can a corporation, whose sole shareholders, along with the corporation, have entered into key-person insurance arrangements that impose on the corporation an obligation to deliver over in cash the insurance proceeds payable upon the death of a shareholder to that shareholder's nominee, legitimately substitute its promise to pay (creating a debt) and use the cash in other ways that serve the interests of the corporation and adversely affect the interests of the decedent's intended beneficiaries?*

*Is the debt arising from the wrongful acts of a lawyer who was a shareholder and officer of the corporation, and also maintained a lawyer-client relationship with the shareholder whose death presented the opportunity for the wrongful corporate use of the cash delivered to the corporation by the insurer as insurance proceeds, a dischargeable debt?*

This is a second appeal from the Bankruptcy Court to this court in this case. For the reasons explained in this opinion, the Order of the Bankruptcy Court from which this appeal was taken must be reversed on grounds apart from the first two questions stated above.

If, however, the second question and all issues of law or fact associated with it can be decided on the merits on the record in this second appeal, other proceedings in the Bankruptcy Court essential to final disposition may be very limited in scope. In that event, a final disposition of this Adversary Proceeding, on the merits rather than on procedural or preclusionary grounds, can occur promptly.

Also, if debatable legal issues raised by the third and fourth questions should be decided in a way that terminates this Adversary Pro-

ceeding without a need for further evidentiary proceedings in the Bankruptcy Court, early disposition on the merits may be possible.

## I. Introduction

On previous remand, the Bankruptcy Court concluded that even if an attorney-client relationship existed between each of the creditors (Lewis and Stuart Jacobs) and the attorney (Pierce, the debtor in this bankruptcy case), the debt at issue was dischargeable because no "defalcation in a fiduciary capacity" had occurred.

After stating the central issue another way, at the outset, the Bankruptcy Court added:

> In other words, does the existence of an attorney-client relationship, *without more,* give rise to the requisite "fiduciary capacity" under [11 U.S.C. § 523(a)(4) ]?

Memorandum of Decision on Remand, September 25, 1995, at 19 (emphasis added). Later in the Memorandum of Decision the Bankruptcy Court stated:

> "Defalcation" does not encompass the type of wrongful conduct that Pierce is alleged to have committed. Rather, it refers to a failure of a fiduciary to produce or account for funds entrusted to him or her.... In other words, defalcation refers only to those breaches of fiduciary duty that involve the mishandling or misappropriation of entrusted funds or other entrusted property.

*Id.* at 18–19 (citations omitted).

These statements of the Bankruptcy Court, framing the issue and declaring a ruling, were based on an error of law that led to the Bankruptcy Court's order dismissing the Adversary Proceeding, without consideration of factual issues this court's earlier decision (of June 1994) had left for consideration in the Bankruptcy Court after remand. If in fact an attorney-client relationship existed—a question of fact not yet decided—then it did not exist "without more." Instead, as a matter of law, for reasons explained in this opinion, that relationship, under undisputed facts, existed along with many other factual circumstances relevant both to the nature of the fiduciary capacity and to the nature of the defalcation.

One of the corporate entities involved in events that were part of the background for the controversy now before this court was P & M Associates, Inc., a corporation in the business of lending money secured by mortgages. At a time before a change of ownership in 1987, the four stockholders of P & M were attorney Robert Pierce, Herman Jacobs (a certified public accountant and a client of Attorney Pierce), Matthew Fisher, and Harvey Madoff.

In a proceeding that preceded by several years the commencement of the present case in which Attorney Pierce is the debtor, P & M filed for bankruptcy in 1989. Bankruptcy Case No. 89–12612–HAL. Until that time Pierce had continued to be the treasurer and one of the directors of P & M.

Before Herman Jacobs died in 1988, Pierce steered Herman Jacobs through decades of corporate, trust, and other transactions designed to serve the client's wishes while also keeping a weather eye to estate planning and avoidance of potentially severe tax consequences for the client, the client's estate, and intended beneficiaries.

After Herman Jacobs died on February 23, 1988, attorney Pierce represented the estate of the deceased client. In part at least because of concerns about tax consequences of a provision in one of the many documents Attorney Pierce had drafted, he sought and obtained the execution of a document prepared by him, under the terms of which the creditor-claimants in this proceeding gave up their rights to a cash payment (of not less than $400,000) into a trust. Because of their status as beneficiaries under that trust, the creditor-claimants in this adversary proceeding would have been entitled to the benefit of that entire sum (in equal shares by their stipulation in this case, though shared differently between them under a possible interpretation of all relevant documents other than this stipulation).

Later still, Attorney Pierce himself became the debtor in a bankruptcy proceeding—the case in which the Adversary Proceeding now on appeal in this court was filed. The appeal now before this court is an appeal from an order favorable to the attorney-debtor (Pierce) in the Adversary Proceeding. The claimants in the Adversary Proceeding are Lewis and Stuart Jacobs, sons of Attorney Pierce's valued client, Herman Jacobs. They assert an assortment of claims based on allegations that they would never have given up their rights in the $400,000 payment had not the attorney knowingly withheld material information about the conflict between their interests and those of other persons and entities the attorney then represented, had represented, or expected that he might represent in the future.

The Adversary Proceeding and the two appeals have been complicated by procedural snarls and skirmishing, described in part in the opinion of this court on first appeal, *Jacobs v. Pierce*, 173 B.R. 20, 24–25 (D.Mass. 1994). At that time this court vacated the decision of the Bankruptcy Court and remanded for further proceedings and findings that might have made it unnecessary for either this court or the Bankruptcy Court to resolve unsettled issues of law considered later in this opinion, to determine the outcome in this case.

After remand, however, the Bankruptcy Court did not make findings on disputable factual issues concerning whether an attorney-client relationship had existed between attorney Robert Pierce, now the debtor, and either or both of the claimants in this Adversary Proceeding, Lewis Jacobs and Stuart Jacobs.

With the benefit of further reflection, four rounds of appellate briefing (a second round on each appeal after issues emerged in oral argument as to which counsel requested and the court allowed further briefing), and the somewhat expanded evidentiary record resulting from proceedings after remand, I conclude that it is appropriate for this court now to consider and decide some of the unsettled issues of law that are potentially decisive of the questions stated as an introduction to this opinion. The decision of these issues may greatly reduce, if not entirely eliminate, the need for further proceedings on remand.

## II. The Context of Undisputed Matters

As needed background for understanding the issues to be examined, this opinion turns

next to quoting parts, and summarizing other parts, of this court's June 1994 conclusions of law and statement of facts determined to be undisputed. This summary also takes account of modifications resulting from supportable findings of the Bankruptcy Court, made in the proceedings after remand, that are not challenged by either party in this second appeal.

## A. *Herman Jacobs and his Family*

Herman Jacobs was a certified public accountant. Lewis and Stuart, two sons by a previous marriage, are creditors in this action. Herman's second wife, who is not the mother of Lewis or Stewart, was Kathryn Jacobs. The allegations of defalcations in this action are related to various provisions Herman made for Kathryn, Lewis, and Stuart in his will and in several trust instruments. There are no claims made in this action that relate to any provisions Herman may have made regarding any other family members.

Herman created the Jacobs Family Trust ("the JFT"), in 1975, amending it in 1983.

On October 27, 1987, Herman executed four documents, each of which was prepared by Robert Pierce, the debtor in this action:

(1) Herman's will (Exhibit 17);

(2) the Herman Jacobs QTIP Trust ("QTIP");

(3) the Herman Jacobs Family Trust ("HJFT") (Exhibit 19) (not to be confused with the Jacobs Family Trust, or "JFT"); and

(4) a deed from the JFT to Herman and Kathryn of the family residence (Exhibit 20);

Herman died on February 23, 1988. He was survived by Kathryn, Lewis, and Stuart.

Kathryn remarried in 1990.

*Jacobs v. Pierce*, 173 B.R. 20, 21–22 (D.Mass. 1994).

## B. *The Jacobs Family Trust ("JFT")*

As stated above, Herman created the JFT in 1975 and amended it in 1983. See Exhibit 12.

Under the terms of the trust, as last amended, Herman was the sole trustee. His brother David was designated to succeed Herman as trustee upon Herman's death.

The trust provided for the payment of annual income to Kathryn commencing upon the death of Herman. Upon the death of the survivor of Herman and Kathryn, or upon Kathryn's remarriage, should she be the survivor, the trust would terminate and the assets be distributed to Lewis and Stuart.

In the event of Kathryn's remarriage— which, as noted above, occurred in 1990— the principal and income of the trust were to be "divided and distributed ... to LEWIS D. JACOBS—TWO–THIRDS SHARE and STUART J. JACOBS—ONE THIRD SHARE."

*After Herman's death, Pierce met with Kathryn, Stuart, and Lewis, at times together, at times separately. He also met separately with David. Pierce drafted an agreement to terminate the JFT, which was signed by Lewis, Stuart, Kathryn, and David, effective on or about March 24, 1988.*

Before submitting the draft agreement to Lewis and Stuart, Pierce had not provided them with any copies of previous drafts, nor with copies of the Stock Agreement [the "Stock Redemption Agreement" of August 11, 1987, concerning all the shares of stock in P & M Associates, Inc.], the QTIP, the JFT, the HJFT, or the will.

173 B.R. at 22 (emphasis added, bracketed material inserted). The events described in the emphasized passage, together with other circumstances to be explained in other parts of this opinion, are potentially decisive against the debtor, Pierce, as a matter of law, thus bringing the Adversary Proceeding to a close without further evidentiary proceedings on remand.

The "FACTS" section of the Bankruptcy Court's Memorandum of Decision on Re-

mand recites additional details about the "Termination Agreement":

> On various dates between March 22 and 30, 1988, Lewis, Stuart, Kathryn, and David Jacobs, as Trustee of the JFT, executed the agreement terminating the JFT and assigning its assets to the QTIP Trust. Pierce drafted the Termination Agreement. The agreement recited that the signatories were terminating the JFT because, before he died, Herman had expressed intent to terminate the JFT and had stated from time to time that it should be terminated. Before submitting this agreement to Lewis and Stuart for their signatures, Pierce had not provided them with copies of previous drafts of the agreement or with copies of the Stock Agreement [more precisely designated as the "Stock Redemption Agreement" of August 11, 1987], the QTIP, the JFT, the HJFT, or the will. But Pierce did give them an opportunity to read the [Termination] agreement just before signing it. And both Lewis and Stuart did read the [Termination] agreement before signing it. Deposition of Lewis Jacobs, p. 94; Deposition of Stuart Jacobs, pp. 63–64.

> Then, on April 15, 1988, P & M issued two checks, apparently on behalf of Herman's estate: one to the IRS for $100,000.00, and another to the Commonwealth of Massachusetts for $18,750.00. Both bear memo notations "Estate of Herman Jacobs"; both are signed by Pierce; and, on both checks, the word "executor" is inscribed under the signature line. These payments were to cover the income tax payments due that day from Herman and Kathryn. Four days later, Pierce, as temporary executor of Herman's estate, executed a promissory note acknowledging a loan to the estate from P & M in the amount of $119,000.00, with interest at one percent per month, payable upon demand. The note was given in consideration of the funds advanced by P & M to the taxing authorities on behalf of the estate.

> By the end of June, 1988, P & M had received proceedings ["proceeds" apparently intended] totalling $405,216.00 from the life insurance it maintained on the life of Herman, to fund the buy-back of stock from the JFT. On August 29, 1988, P & M issued two checks totalling $400,000.00 to "David Jacobs, Trustee of the Jacobs Family Trust and to the Estate of Herman Jacobs." On the reverse, each check was first endorsed "For Deposit Only/P & M Associates, Inc./390–018–5/Payment in full settlement for capital stock in Company"; and, beneath this first endorsement, each was endorsed by David Jacobs as trustee of the JFT and then by Pierce as executor of the estate. On the same day, P & M issued to Pierce and Kathryn, as trustees of the QTIP Trust, a subordinate debenture in the amount of $300,000.00, payable August 29, 1991, with interest at 12 percent per annum, payable quarterly. The debenture is signed by Harvey Madoff, as president, and Pierce, as treasurer....

Memorandum of Decision on Remand at 7–9 (footnotes omitted, bracketed material inserted).

The Bankruptcy Court recited additional details in the section of the Memorandum of Decision on Remand entitled "PROCEDURAL HISTORY":

> By their complaint in this adversary proceeding, the Plaintiffs seek a determination that their unliquidated and unadjudicated claims against Pierce are excepted from discharge. The complaint alleges that Pierce carried out an elaborate scheme to defraud them, as beneficiaries of the JFT, from their beneficial interests in the $400,000 that the trust was entitled to receive under the buy-back agreement [that is, the "Stock Redemption Agreement"]; and that by doing so, he enabled P & M, of which he was an officer, director, and shareholder, to retain the $400,000.

> Specifically, the Plaintiffs contend that Pierce, acting as their attorney, counselled them to terminate the JFT—because it would result in a tax savings for the estate and protect their inheritance under the will—and drafted the Termination Agreement; that, when he did so, he knew that terminating the trust was not in their interest and would not result in a tax savings; and that, although he had a fiduciary duty to do so—as their attorney, executor,

and as trustee of the both the HJFT and the QTIP Trust—he failed to inform them of material facts that would have given them cause not to terminate the trust. Believing that Pierce was acting in their best interest and relying on his advice, the Plaintiffs agreed to sign the Termination Agreement. The agreement transferred the JFT's shares of stock in P & M to the QTIP Trust and terminated the Plaintiffs' beneficial interest in the stock and the proceeds thereof. Had the [JFT] trust not been terminated, Kathryn's interest in the trust would have terminated upon her remarriage in 1990, and the remaining assets, which allegedly would have been at or above $400,000, would then have been distributed to the Plaintiffs.

The Plaintiffs allege that Pierce, in drafting the Termination Agreement, included the QTIP Trust provision (the provision transferring the assets of the JFT to the QTIP Trust) because, as a trustee of the QTIP Trust, he would thereby obtain legal control over the transferred assets, the P & M stock. (Pierce was not trustee of the JFT; had the stock remained in that trust, Pierce would not have had control over it, or over the attendant claim against P & M for $400,000.) Pierce then arranged for the QTIP Trust to accept a $300,000 subordinated debenture from P & M in lieu of the immediate cash payment to which the QTIP Trust was entitled under the stockholders agreement.

The complaint thus states the Plaintiffs' claims against the Debtor. The Plaintiffs contend that the claims are excepted from discharge as debts for "fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4).

Pierce denies many of the allegations in the complaint and defends against the claims themselves, and against the Plaintiffs' objections to their dischargeability, on various grounds. First, he contends that the Plaintiffs entered into the termination agreement on their own initiative, because they wanted to effectuate Herman's intention to afford Kathryn the freedom to remarry without forfeiting her interest in the trust assets. Second, he contends that with respect to the termination agreement,

he acted only as scrivener, not as attorney for the Plaintiffs. Third, he maintains that before the termination agreement was executed, he either gave or made available to the Plaintiffs copies of their father's will and of the JFT. Fourth, he states that there is no evidence as to whether Kathryn would have remarried had the JFT not been terminated; nor is there evidence concerning the value of the remainder interests in the JFT that the Plaintiffs lost by terminating that trust.

*Id.* at 10–12 (bracketed material inserted).

### C. *P & M Associates, Inc. ("P & M")*

Part III of the present opinion explains relevant circumstances about P & M Associates, Inc. ("P & M"), a corporation in which attorney Pierce was deeply involved, along with his long-time valued client, Herman Jacobs, and others.

### D. *Herman Jacob's Will*

As stated above, Herman executed his will on October 27, 1987.

The will named Robert Pierce as executor. [Pierce] was appointed temporary executor on March 23, 1988. When the will was allowed, on April 29, 1988, Pierce was appointed permanent executor.

According to the terms of the will (Article XII), HJFT was to receive "the maximum amount which can be absorbed by the unified credit and the Commonwealth of Massachusetts death tax credit." The parties agree that the relevant amount, for the dates in question, was $642,420. The QTIP was to receive the residue (Article XIII).

173 B.R. at 22–23.

### E. *The Herman Jacobs Family Trust ("HJFT")*

As stated above, the HJFT was created by Herman on October 27, 1987.

Pierce was named as, and has until now served as, the sole trustee of the HJFT.

Lewis and Stuart were the primary beneficiaries. The HJFT provided that after the death of Herman, the trust would terminate and the principal and income would

be distributed "in equal shares" to Lewis and Stuart.

As stated above, the will provided that the HJFT was to receive "the maximum amount which can be absorbed by the unified credit and the Commonwealth of Massachusetts death tax credit," an amount the parties agree was $642,420. In fact, however, the HJFT has never been funded.

173 B.R. at 23.

### F. *The QTIP Trust*

As stated above, the QTIP Trust was created by Herman on October 27, 1987.

Pierce and Kathryn were named as, and have until now served as, co-trustees of the QTIP.

Under the terms of the QTIP, the trustees must pay the net income to Kathryn at least annually, and are empowered to distribute the principal to her in their "uncontrolled discretion."

The QTIP trust does not have a disqualification upon remarriage.

Upon Kathryn's death (which has not yet occurred), the QTIP terminates, with one half of its assets to be divided equally between Lewis and Stuart, and the remainder payable to seven charities.

So far as the record discloses, the only asset of the QTIP is a $300,000 debenture issued by P & M; . . . .

173 B.R. at 23.

### G. *Key Elements of an Ongoing Course of Events*

The following are key elements of an ongoing course of events that set the context for decisive legal and factual issues of the Adversary Proceeding that is the subject of this second appeal.

1. The Stock Redemption Agreement and other contractual documents establishing an insurance-funded stock-purchase agreement for all P & M stock, which was owned by the only four stockholders, were signed on or about August 11, 1987. Attorney Robert Pierce drafted all of these documents with the exception of the insurance policies. Gaps exist in the record before this court concerning the scope and precise text of oral and written communications between Pierce, or any other representative of P & M, or any of the three other individual stockholders, and any representatives of the insurance company (or companies) about the precise terms of various provisions of the insurance policies.

2. It is also unclear from the record the precise date that Herman Jacobs transferred ownership of all of his shares of stock in P & M to the JFT. This event did, however, occur during the long period when Herman Jacobs was a valued client of Pierce and Pierce was advising this client about estate planning matters as well as drafting documents for signature by Herman Jacobs.

3. Herman Jacobs died on February 23, 1988.

4. On March 8, 1988, David Jacobs, who had just succeeded Herman as trustee of the JFT upon Herman's death, assigned the shares held by JFT to P & M. Attorney Pierce prepared the document that David Jacobs signed to effectuate this transfer, and attorney Pierce signed as witness to the signing by David Jacobs.

5. In the course of the events material to issues in this case Robert Pierce occupied, in addition to the role of attorney in various attorney-client relationships, the following additional fiduciary roles:

(a) Pierce was an officer, director, and stockholder of P & M. Under Massachusetts law, an officer-director occupies a fiduciary role. *See, e.g., Boston Children's Hospital Trust [Boston Children's Heart Foundation, Inc.] v. Nadal Ginard,* 73 F.3d 429, 433–34 (1st Cir.1996).

(b) Pierce was co-trustee, with Kathryn, of the QTIP.

(c) Pierce was executor of Herman's estate.

(d) Pierce was sole trustee of the HJFT. At no time, however, was Pierce a trustee of the JFT.

Part III of this opinion explains more about the nature and consequences of the transaction of March 8, 1988, (¶ 4 immediately above) and the later succession of relevant events.

### III. More Facts Relevant to Pierce's Alleged Defalcations

Attorney Robert Pierce's different roles in the course of events preceding his own bankruptcy are material to the various claims of defalcation made against him.

Some of the procedural and legal background bearing on the claimed defalcations in this case was recited in Part IV of this court's June 1994 opinion.

> The creditors contend that Pierce committed two separate defalcations.
>
> The first defalcation, they contend, is that Pierce wrongfully induced Lewis and Stuart Jacobs to agree to the termination of the JFT. The contention runs roughly as follows. Pierce is alleged to have induced Lewis and Stuart to terminate the JFT by representing to them that terminating the JFT could avoid substantial taxes on the estate, without in any way diminishing Lewis's and Stuart's inheritance. But for the termination of the JFT (the theory goes), the JFT would have received $400,000 in cash for the buy-back of the stock in P & M, and Lewis and Stuart, as beneficiaries of the JFT, would have received those funds.
>
> The second defalcation alleged is that, as executor, Pierce failed to fund the HJFT, as was required by the terms of the will. Instead, the funds went to the QTIP. Since Lewis and Stuart have only a residuary interest in the QTIP, and were the primary beneficiaries of the HJFT, this failure had the effect of denying them access to the funds.

173 B.R. at 25.

The creditors also argue, however, and with some force, that the bankruptcy court's interpretation of the Stock Agreement [more precisely identified as the "Stock Redemption Agreement"] is incorrect as a matter of law. Reviewing the Stock [Redemption] Agreement de novo, I conclude that the bankruptcy court erred in holding that the JFT was not entitled to payment of the $400,000.

It is true, as the bankruptcy court noted, that the Stock [Redemption] Agreement contained a clause stating that "the purchase price for the stock of the decedent shall be paid to the estate of the decedent as follows ...." (p. 5). Taken by itself, that clause authorizes payment to the estate. But the agreement as a whole cannot be taken to authorize payment to the estate in every instance. Rather, the agreement contemplated payments to family trusts in some circumstances, including those present in this case.

The first page of the Agreement, on two separate occasions, listed the parties to the agreement. Herman was listed as "HERMAN JACOBS, TRUSTEE OF THE JACOBS FAMILY TRUST," whereas the other three stockholders were listed in their individual capacities. The line where Herman signed the agreement was similarly marked. ["HERMAN JACOBS, TRUSTEE OF THE JACOBS FAMILY TRUST, STOCKHOLDER," each other signer being identified by his individual name, followed by "STOCKHOLDER".]

> Paragraph 11 of the Agreement stated:
>
> Further notwithstanding anything herein contained to the contrary, Corporation and Stockholders hereby agree that Stockholders may transfer the stock in Corporation which they own to a trust for the benefit of their wives and/or children and in the event said stock is transferred to such a trust, then the trustee of such trust must sign a document acknowledging that the receipt of such stock transferred by the Stockholder is subject to the terms and provisions of the Agreement and that the trustee of such trust shall be bound by all of the terms and provisions of this agreement as though such trustee was an original party to this Agreement. Such trustee shall have the same responsibilities and obligations as the legal representative and/or estate of such Stockholder if and when such Stockholder becomes deceased.

Exhibit 14.

This provision, particularly since it begins "notwithstanding anything herein contained to the contrary," manifests an overarching intention to allow any shareholder to substitute a family trust for himself and

his estate. The provision did not, however, explicitly state that the trust would succeed to the *rights* of the shareholder or the estate; it only said that it would succeed to the *responsibilities and obligations*.

The agreement must be read, however, as implying that rights, as well as obligations, are to be transferred. Any other reading is inconsistent with the manifested intent of the parties to allow stock to be placed in family trusts. It would make no sense for an individual to transfer stock to a trust for the benefit of one's family, if, upon one's death, the trust would be forced to disgorge the stock in favor of the estate.

Reading the agreement as allowing payment to the trust, in return for the trust's surrender of the stock, is supported when one examines more closely the clause (Paragraph 5) cited by the bankruptcy court as authorizing payment only to the estate. That was a clause (titled "payment of purchase price") that specified that payment was to be made in cash, except under certain conditions. . . . Thus the emphasis was not on the party to whom payment would be made, but rather the manner in which payment would be made. That paragraph 5 specifically referred to "pa[yment] to the estate," without mentioning payment to trusts, does not mean that payment would always be to estates, because, as noted above, paragraph 11 is reasonably read as providing that "notwithstanding anything herein contained to the contrary, all the provisions of the agreement that apply to an estate apply to a trust as well, if the trust holds the stock in accordance with the terms of the Stock [Redemption] Agreement."

This court reverses the legal determination of the bankruptcy court that the [Stock Redemption] agreement authorized payment only to the estate. This ruling, in itself, does not determine whether there was a defalcation in regard to the JFT. As noted, the bankruptcy court did not reach the question whether Pierce's conduct involving the termination of the JFT was appropriate.

173 B.R. at 26–27 (emphasis in original, bracketed material inserted)

This court's June 1994 opinion reflected this court's anticipation that resolution of potentially disputable factual issues left for consideration in the Bankruptcy Court on remand might make it unnecessary for either this court or the Bankruptcy Court to probe more deeply legal issues that are at least in part unsettled issues of state law, which federal judges, both in bankruptcy courts and district courts, should leave to be decided in state courts unless deciding them is essential to determining outcome in a case that the federal court has no authority to transfer to a state court. Certification to the state's highest court is a possibility to be considered, but is at best a dubious option when, first, unsettled rules of the state and federal law governing lawyers are potentially overlapping and, second, at least one of the parties in the case contends that both state and federal law applicable generally must be modified and adapted to distinctive circumstances of bankruptcy proceedings that a lawyer-debtor argues weigh in favor of less stringent protections for bankruptcy creditors.

I do not understand the decisions of either of the bankruptcy judges in this adversary proceeding as grounded on a premise that attorneys in bankruptcy proceedings are subject to less demanding rules of professional responsibility than are attorneys in proceedings in a United States district court or a state court, or attorneys engaged in outside-court estate planning, counseling, and representation. I conclude, however, that the grounds on which the two bankruptcy judges have each ordered dismissal of the complaint in this adversary proceeding are, as a matter of law (and even before taking into account issues concerning the law governing lawyers) not supportable. Thus, I must again remand with instructions for additional evidentiary proceedings bearing upon other grounds potentially decisive of outcome unless, after probing more carefully both those issues and the conflict-of-interests issues, I conclude that answering previously unanswered questions of law will be enough to decide some part or all of this controversy.

Weighing in favor of an effort to decide this case without reaching professional responsibility issues—thus taking a hands-off

view of these issues at least during adjudication of this appeal—is the fact that in part, at least, professional responsibility issues may be seen as concerns about ethical aspirations and guidelines, more appropriate for consideration in some other forum. Even "disciplinary rules" often provide something short of clear and explicit notice to attorneys about what they may do or must not do in the face of a specified kind of conflict of interests.

Weighing against a hands-off view of professional responsibility issues in deciding this case, however, is the inescapable fact that the matters that have been before the Bankruptcy Court and are now before this court on appeal could not have been treated in that court in this case, and cannot be treated in this appeal, as if this were a disciplinary proceeding. Thus, this is not a proceeding in which assertions of good faith and lack of clear notice may be especially compelling because professional discipline is at issue. Instead, this is a proceeding in which *claims to the adjudication of rights of parties to the case must be decided.* The merits of the claims to be adjudicated may depend on the law governing lawyers. If they do, then the issues of the law governing lawyers presented by this case cannot properly be characterized as merely questions about ethical exhortations or even disciplinary rules that concern professional responsibility but do not affect civil claims for remedies brought by clients or others against lawyers.

In these circumstances, in Part IV, I proceed first, to consider the meaning of § 523(a)(4) and what constitutes a "fiduciary relationship" and a "defalcation" under case law interpreting those terms. Second, in Part V of this opinion, I consider sources of guidance, in general, regarding the law that governs a lawyer's response to a conflict of interests, and how that law may bear upon questions about "defalcation in a fiduciary capacity."

### IV. The Legal Test for Defalcation in a Fiduciary Capacity

#### A. *An Excerpt From the June 1994 Opinion Used as a Premise for Arguments on the Second Appeal*

Some parts of the legal background bearing on the claimants' contentions that Robert Pierce committed defalcations in a fiduciary capacity were recited in the following passage from Part IV of this court's June 1994 opinion:

A debt for "defalcation while acting in a fiduciary capacity" is not dischargeable. 11 U.S.C. § 523(a)(4). In the bankruptcy context, the meaning of the term "defalcation" is not necessarily limited to intentional wrongs. Courts may, for example, find defalcation where there was willful neglect of a fiduciary duty. *See, e.g., Matter of Moreno,* 892 F.2d 417, 421 (5th Cir.1990) (internal citations omitted)

In the context of bankruptcy, "fiduciary" has a narrower meaning than in other contexts. It includes only those relationships that existed before, and without reference to, the act asserted to be a defalcation. In other words, although in some legal contexts, the commission of a wrongful act may itself create a fiduciary relationship—sometimes called a "constructive trust"—the commission of such an act is not considered a "defalcation *while acting in a fiduciary capacity*" under the bankruptcy statute (emphasis added). *See* 2 David G. Epstein, et al., *Bankruptcy* § 7–28 at 367–68 (1992).

173 B.R. at 25.

█ The precedents and secondary authorities cited in this passage make the point that a court deciding a dispute about a "defalcation in a fiduciary capacity" must be sensitive to distinctive features of bankruptcy proceedings and bankruptcy law when deciding an issue that arises, in its precise details, only in bankruptcy cases and not elsewhere in the larger legal system of which bankruptcy is one part.

Some of the contentions advanced on behalf of Appellee Pierce in the briefing on second appeal appear to be based on an assumed premise that this court had ruled, in the passage quoted above, that this court and the Bankruptcy Court must look *only* to precedents and secondary authorities directly commenting on "defalcation in a fiduciary capacity" and not at all to analogies in other contexts of the larger legal system. This court made no such ruling and, indeed, dur-

ing oral arguments in this case, has repeatedly emphasized the potential usefulness of taking account of analogies outside bankruptcy law. In any event, I need not and do not respond further to an assumed or explicit premise that this court is now itself limited by a passage in its opinion that has been interpreted as saying we must look only to bankruptcy law for guidance on how to answer unanswered questions of law. Nothing has occurred in this case to bar this court's reconsideration of its position on any *issue of law*.

### B. *Premises of Legal Reasoning in Deciding Issues Within a Specialized Body of Law*

█ Even had this court taken an erroneously narrow view of the matter on first appeal, the error would be subject to correction by this court, or by a higher court, and the present opinion precisely and directly rules, now, that it is appropriate to seek guidance on unsettled issues of law from analogies and pervasive principles of the larger body of law from which distinctive legal tests applied in bankruptcy cannot be entirely severed.

This general principle underlying the American legal system applies not only to the relationships between bankruptcy law and the larger legal system but as well to every other body of specialized law in the legal system. A "conventional [legal] test" for use in making decisions about a particular question that arises often in some identified small segment of one legal specialty may not be apt when invoked in out-of-the-ordinary circumstances that make the issue to be decided "not ordinary fare but an odd variation, caused by the interplay of ordinary factors" with another legal concept. *Bergersen v. Commissioner of Internal Revenue Service*, 109 F.3d 56, 59 (1st Cir.1997). In *Bergersen*, the "interplay" was between "loan or dividend" classification of a transfer of cash (from th e coffers of a closely-held corporate entity to the principal shareholders) and "Puerto Rico tax status," in United States income tax law. *Id.* This point made in the *Bergersen* opinion applies with equal force to the "interplay" in this case among the bank-

ruptcy law concept of "defalcation in a fiduciary capacity," dischargeability of debt under 11 U.S.C. § 523(a)(4), the law governing key-person insurance transactions, and the law governing lawyers with respect to a lawyer's conduct in circumstances of conflict of interests. No one of these areas of the law is an island unto itself. Analogies from each, and from other segments of the larger body of law (including, for example, an opinion on tax law such as that just cited) may clarify a seemingly narrow issue for decision and provide needed guidance to its resolution on the merits.

### C. *Guidance from Statutory Provisions and Precedent Explicitly Considering Defalcation in a Fiduciary Capacity*

█ Throughout the legal system, in each specialized area of law and in law more generally, a court ordinarily turns first to the text of a statute when required to determine the *meaning of the statute* for the particular context presented by a case before the court for adjudication. *E.g., Bailey v. U.S.,* —— U.S. ——, ——, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995); *In re Bajgar,* 104 F.3d 495, 497 (1st Cir.1997).

The statutory text that must be applied to decide this case is as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4).

Appellee Pierce asks the court to hold that precedents have established a meaning narrower than the meaning of these words in ordinary usage. He argues that precedents define "fiduciary" more narrowly than its meaning in other legal contexts generally. I accept this proposition as an assumption to the extent that the point is merely that bankruptcy law generally has rejected a rule, applied in many other contexts, that *where no fiduciary relationship existed before the person against whom a claim is made committed a wrongful act,* then the wrongful act itself creates a fiduciary relationship, some-

times called a "constructive trust." *See* 2 David G. Epstein, et al., *Bankruptcy* § 7–28 at 367–68 (1992).

As the Court of Appeals for the 11th Circuit has explained, the difficulty in identifying whether a particular fiduciary relationship satisfies the first prong of § 523(a)(4) is that:

The Supreme Court has consistently held that the term "fiduciary" is not to be construed expansively, but instead is intended to refer to "technical" trusts. Unfortunately, the Supreme Court has not spoken on this issue since the *Davis* case, leaving the lower courts to struggle with the concept of "technical" trusts. In nineteenth century jurisprudence, the concept of "trust" generally fell into two categories: (1) a voluntary trust, created by contract, often referred to as an "express" trust, and (2) a trust created by operation of law, such as a constructive trust or resulting trust, which generally served as a remedy for some dereliction of duty in a confidential relationship, regardless of the intentions of the parties.

In the early judicial interpretation of the predecessors to § 523(a)(4), the courts seemed to include the voluntary, "express" trust within the scope of "fiduciary capacity," while excluding the involuntary resulting or constructive trust from the scope of the exception. *Davis* and other cases also articulated a requirement that the trust relationship have existed prior to the act which created the debt in order to fall within the statutory exception. A resulting trust would therefore not fall within the exception because the act which created the debt simultaneously created the trust relationship.

The difficulty arose with the advent of statutorily-created "trusts." Statutes, such as O.C.G.A. § 33–23–79, create fiduciary duties that are dependent upon the relationship between the parties, but fit into neither of the traditional categories. They are not agreed upon by the parties, nor are they created ex post as a remedial measure to right a wrong. The lower courts have struggled with reconciling this new type of fiduciary duty with the tradi-

tional categories, but have failed to produce uniform results.

*Quaif v. Johnson,* 4 F.3d 950, 953 (11th Cir.1993) (internal citations omitted); *citing Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934).

■ The appellants argue that, under Massachusetts precedent, even a statutory trust is insufficient to create the type of fiduciary relationship that will make a debt non-dischargeable if it is the result of a defalcation. *See, e.g., In re Christian,* 172 B.R. 490 (Bankr.D.Mass.1994) (Mass. law requires express legislative design to create a trust relationship that creates fiduciary relationship). Even assuming this to be true, for the purposes of this section, this court is not faced with the problem of identifying the precise nature of the trust relationship between Pierce and Lewis and Stuart Jacobs because *Pierce was the trustee of the HJFT and the OTIP.* These trusts are distinctly not technical trusts under any standard, and Pierce occupied his fiduciary role as trustee of these trusts before his acts that gave rise to this adversary proceeding.

It is not true, however, that Pierce is alleged to have occupied a fiduciary role only by reason of his position as trustee of the HJFT or the QTIP. To the contrary, in the present case, the claimants are asserting that Pierce had already occupied several fiduciary relationships before he committed defalcations on which claims are made. As noted earlier in this opinion, at page 16, Pierce may have occupied other fiduciary roles as executor, attorney, and corporate officer, as well as trustee of the HJFT and the QTIP, before the events occurred that now are the subject of this adversary proceeding. The claimants are asserting that each of these fiduciary relationships imposed on Pierce obligations that he violated. If these contentions are supported, the multiple violations of distinct fiduciary obligations, taken together, present a claim of an exceptionally aggravated instance of defalcations that violated obligations incident to fiduciary relationships existing before each of the identified defalcations occurred.

Because Pierce occupied each fiduciary role before and apart from the wrongdoings

alleged, each of the reported decisions on which the Bankruptcy Court relied, and on which Appellee Pierce relies, that is reasoned on "constructive trust" theory is not on point here as to claims based on the assertion that Pierce was a "fiduciary" by reason of one or more relationships other than "constructive trust."

Other opinions cited by the Bankruptcy Court in its Memorandum of Decision on Remand, and relied upon by Pierce, reach a conclusion that a "defalcation in a fiduciary capacity" did occur in the case under adjudication. Appellee's reading of any opinion in such a case, announcing a finding of "defalcation in a fiduciary capacity," as precedent for the proposition that no set of facts other than one like those of the case being decided would be sufficient to constitute a "defalcation in a fiduciary capacity," is more wishful than realistic unless the court explicitly stated that it was, by choice, announcing a rule broader than necessary to decision of the case then before the court. Appellee has failed to call attention to any such broadly sweeping language in any of the opinions cited.

Thus, the court concludes that Pierce occupied several fiduciary roles that fall within the meaning of "fiduciary" as the term is used in § 523(a)(4), and those fiduciary relationships existed before, and independently of, the alleged wrongdoings.

**D. *Recent Additional Precedents***

Whatever reading one might reasonably have made of the precedents available to the Bankruptcy Court at the time of issuance of the Memorandum of Decision on Remand, reexamination is now appropriate because more recent reported decisions weigh heavily against the legal conclusions then expressed by the Bankruptcy Court.

An example is the decision of the Court of Appeals for the Ninth Circuit in *In re Niles*, 106 F.3d 1456 (9th Cir.1997). In that case, as here, the existence of a fiduciary relationship did not depend on the alleged defalcation itself. The fiduciary relationship was that of a licensed real estate broker collecting rents in a property management relationship. *Id.* at 1458–59. The defalcation in a

fiduciary capacity was that the fiduciary "misappropriated a check for $8,914.59, thus committing a defalcation within the meaning of the Act." *Id.* at 1461, *citing Lewis v. Scott*, 97 F.3d 1182, 1186 (9th Cir.1996) ("the fiduciary relationship ... [arose] from an express or technical trust that was imposed *before and without reference to the wrongdoing* that caused the debt") (emphasis added).

A similar result to that reached in *Niles* is also seen in other recent cases dealing with real estate professionals, who are considered trustees by reason of engaging in the licensed activities of a real estate broker: misrepresentations made in this capacity can constitute defalcation because the trust relationship stems from the licensing itself. Thus, because there is a trust relationship that exists before the wrongdoing, the debts of licensed real estate brokers can be nondischargeable. *See In re Rodriguez*, 196 B.R. 537 (D.Cal.1996); *aff'd In re Rodriguez*, 110 F.3d 69, 1997 WL 144187 (9th Cir.1997).

Also, the Court of Appeals for the Ninth Circuit has elaborated on the meaning of "defalcation" and "fiduciary relationships" under § 523(a)(4) in *Lewis v. Scott*, 97 F.3d 1182 (9th Cir.1996). In that case, the court first found that, under Arizona law, a partnership embodies "an 'express' or 'technical' trust relationship, rather than a trust ex maleficio, within the meaning of section 523(a)(4)." *Id.* at 1185. The debtors 1) failed to provide their partner with a complete accounting of the partnership investments and assets and 2) commingled the partner's investment funds with their own funds. *Id.* at 1186. The Court of Appeals decided that each of these acts constituted a defalcation under 523(a)(4). *Id.* Thus, the improper commingling of funds or the failure to account for funds was sufficient to constitute a defalcation so as to make the debt nondischargeable in bankruptcy, in part because the fiduciary relationship, the partnership, existed before and independently of the alleged wrong.

The nature of the relationship that constitutes a fiduciary relationship and the acts that constitute a defalcation are also illuminated by the judicial reasoning in cases in-

volving self-serving transactions by a director of a corporation. Although courts have reached mixed results in these cases, recent case law provides ample support for the premise that, if a director wrongs the corporation he is supposed to serve, often the resulting debts are non-dischargeable. In general, the decisive issue in these cases is whether the director is under an obligation to the corporation that can fall within the definition of fiduciary duty. Numerous courts have found this to be the case, despite the absence of an express trust agreement. For recent examples, see *In re Shultz*, 205 B.R. 952 (Bankr.D.N.M. 1997) (Delaware law imposes fiduciary duty on director of corporation who engages in self-serving transactions) and *Clark v. Allen*, 206 B.R. 602 (Bankr. M.D.Fla. 1997) (summary judgment not appropriate on issue of whether lawyer, who was also on board of directors, committed defalcation in a fiduciary capacity by engaging in professional negligence or by not acting in good faith and loyalty in dealing with corporation).

Support for the conclusion stated in the next preceding paragraph appears also in cases in which defalcation is described in a different phrasing, such as "a willful neglect of duty," but the facts before the court involved a mishandling or failure to account for entrusted funds and the phrase "willful neglect" focused on the state of mind or degree of fault needed to support a finding of defalcation, not on the source of the legal duty, violation of which becomes a "defalcation." *E.g., Matter of Moreno*, 892 F.2d 417 (5th Cir.1990); *In re Gans*, 75 B.R. 474, 490 (Bankr.S.D.N.Y.1987) (*"Having once established that a fiduciary relationship exists*, it merely need be shown that the underlying trust fund was used for a purpose other than that contemplated by the trust to constitute defalcation") (emphasis added).

A survey of recent cases reveals that the concept of a "fiduciary" in the context of § 523(a) is not a static one. Rather, the concept is evolving to encompass debtors who may not be trustees under a narrowly technical definition of that word, but are nonetheless much more closely aligned with that role than the role of a debtor in a mere creditor/debtor relationship. Having determined that the definition of "fiduciary" in § 523(a)(4), although confined, is broad enough to encompass several of the roles that Pierce occupied before the alleged wrongdoings, I next move on to examine what constitutes a "defalcation" under that statute.

### E. *Contrasting Perspectives on Defalcation*

The reasoning of the Bankruptcy Court stated in the Memorandum of Decision on Remand is founded on a premise that the meaning of "defalcation," for bankruptcy purposes, extends only to a misappropriation of cash like that of an agent or fiduciary who takes money out of the till and immediately pockets it. In support of that narrow interpretation the Memorandum of Decision on Remand turns to dictionary definitions of "defalcation." Memorandum of Decision on Remand at 19–20 and n. 10.

It is true that, not only in the bankruptcy context but more generally, the usual meaning of *"defalcation"* concerns misappropriation of money in one's charge. For example, Bryan A. Garner, *A Dictionary of Modern Legal Usage* (2d ed.1995), defines *"defalcate"* as meaning "to misappropriate money in one's charge." *Id.* at 255. *See also The Random House Dictionary of the English Language* 521 (2d ed. unabridged 1987), defining "defalcation" as meaning "misappropriation of money or funds held by an official, trustee, or fiduciary."

The definitions cited in the Memorandum of Decision on Remand are consistent with this theme. That Memorandum, however, fails to take into account definitions in the same and other dictionaries of the words "misappropriate" and "misappropriation" that commonly appear in the definition of "defalcate" or "defalcation." For example, *"misappropriate"* ... means "to apply (as another's money) dishonestly to one's own use." Garner, *supra,* at 563. *See also Black's Law Dictionary* (5th ed.1979), defining "misappropriation" as the "act of misappropriating or turning to a wrong purpose" and adding that the word "may also embrace the taking and use of another's property for

sole purpose of capitalizing unfairly on good will and reputation of property owner," *citing Pocket Books, Inc. v. Dell Pub. Co.,* 49 Misc.2d 252, 267 N.Y.S.2d 269, 272 (N.Y.Sup. Ct.1966); *Random House, supra,* at 1229, defining "misappropriate" as meaning "1. to put to a wrong use. 2. to apply wrongfully or dishonestly, as funds entrusted to one's care."

Of course, the unqualified word "misappropriation," in some contexts, has broader meaning than the phrase "misappropriation of funds"—a phrase commonly used in defining "defalcation." But the Bankruptcy Court's reasoning is premised on an even narrower meaning of "defalcation" and "misappropriation of funds" than, for example, the meaning explained in *Niles, supra,* 106 F.3d 1456, a recent decision of the Ninth Circuit focusing upon *"defalcation in a fiduciary capacity"* in bankruptcy law. *See* page 30, above, of this opinion. *See also Matter of Boyle,* 819 F.2d 583, 587 n. 9 (5th Cir.1987) (the omission of "misappropriation" from § 523(a)(4) should not be taken as evidence of a Congressional intent to further restrict the meaning of "defalcation").

The Bankruptcy Court from which the present appeal was taken recognized that its ruling rested on its interpretation of a set of decisions reasoned in ways inconsistent with the reasoning of another body of bankruptcy precedents. Memorandum of Decision on Remand at 20–23.

The reasoning of precedents, including more recent precedents, discussed in Parts IV.D above and V.D below, underscores the point that even the definitions cited by the Bankruptcy Court, both those taken from dictionaries and those taken from opinions in bankruptcy cases, are broad enough to encompass, within the meaning of "defalcation," the conduct of one who had already occupied several fiduciary relationships before the conduct alleged to be a defalcation occurred, thus making it unnecessary for claimants to rely upon the creation of the fiduciary relationship, under "constructive trust" theory, *by the very wrongful act claimed.*

■ The Bankruptcy Court focused also on what was conceived to be an obstacle to the existence of a "trust" in that Pierce never

held legal title to "the property" alleged to be held in trust. This, too, is a perspective that becomes irrelevant once it is recognized that the fiduciary obligations violated by Pierce were not obligations arising only at the moment that a wrongful act occurred. Thus, it need not be the case that there was a wrongful act that resulted in the debtor's receiving cash.

Moreover, Pierce in fact asserted dominion over the cash received in the form of insurance proceeds payable upon the death of Herman Jacobs. It matters not whether he did so as an officer and director of P & M, as an individual, or in some other capacity. He was in fact the person who diverted the cash to P & M to serve P & M's interests and his own, at the same time depriving the JFT and its beneficiaries of the benefit of an immediate transfer of the cash to the JFT in accordance with contractual obligations. The fact that *one role* Pierce did *not* occupy was as trustee of the JFT cannot immunize him from a finding that his acts constitute a defalcation. The defalcation was, if also of a kind creating a "constructive trust" in nonbankruptcy law, only *worse* rather than being immunized in the bankruptcy context (in whatever capacity he was acting), if he did not even have legal title to the check, or to the cash proceeds or an accounting entry resulting from "cashing the check."

■ The perspective adopted by the Bankruptcy Court is unpersuasive as a defense for Pierce for another reason as well. The legal power (as distinguished from rightful authority) of a holder of cash to transfer to another the legal power to deal with it as the other may wish is very much more extensive than the legal power to transfer other kinds of property. Thus, the existence of fiduciary obligations of Pierce in the circumstances of this case is not at all dependent upon finding an "entrustment" of funds that would satisfy the law of Massachusetts with respect to "an express or technical trust," discussed in the Bankruptcy Court's Memorandum of Decision on Remand at 23–26 and n. 13.

## V. Conflict of Interests

### A. *Introductory Questions*

Does the law governing lawyers, with respect to a lawyer's response to conflict of

interest, require disclosures by the lawyer to persons whose interests may conflict with those of a client incident to the prospect that the client may wish to consider the benefits of bankruptcy as an option? ·A client might so wish well before the time when a bankruptcy proceeding may be initiated. Are disclosures required, whenever the lawyer first contemplates that a client may become a debtor in a bankruptcy proceeding? Or, even earlier, when the lawyer is drafting estate planning documents for a valued client? Or when the lawyer confers with family members, who are not represented by other attorneys, about their understandings or preferences about interests in corporations and trusts formed by the lawyer's valued client with the lawyer's assistance as attorney, personal adviser, or both?

To answer these questions, one needs to consider sources of authority regarding the law governing lawyers. This opinion turns next to that subject.

## B. *The Massachusetts Code of Professional Responsibility*

Under D. Mass. L.R. 83.6(4)(B), members of the Bar of this court are subject to the Code of Professional Responsibility set forth in the Rules of the Supreme Judicial Court of Massachusetts. Rules of the Supreme Judicial Court, Chapter 3. Attorneys licensed to practice in the Commonwealth of Massachusetts are governed by the same Code. This Code is patterned after the ABA Code of 1970, though with a few modifications. Provisions regarding conflict of interests appear under Canon 5, which declares:

**A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client**

*Id.*, Canon 5. The Disciplinary Rules appearing under Canon 5 include the following:

**DR 5–101. Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment**

(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

\* \* \* \* \* \*

**DR 5–104. Limiting Business Relations with a Client**

(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

\* \* \* \* \* \*

**DR 5–105. Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer**

\* \* \* \* \* \*

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

\* \* \* \* \* \*

**DR 5–107. Avoiding Influence by Others Than the Client**

(A) Except with the consent of his client after full disclosure, a lawyer shall not:

(1) Accept compensation for his legal services from one other than his client.

(2) Accept from one other than his client anything of value related to his representation of or his employment by his client.

\* \* \* \* \* \*

**DR 5–108. Drafting Instruments in Which the Lawyer Has an Interest**

(A) A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee.

*Id.,* Canon 5, DISCIPLINARY RULES.

██ A careful reading of these Disciplinary Rules compels the conclusion, as a matter of law, that Attorney Pierce's conduct in drafting the Termination Agreement after having previously drafted the Stock Redemption Agreement violated Massachusetts Disciplinary Rules. It does not necessarily follow, however, that his violation of one or more of the provisions in these Disciplinary Rules was also a "defalcation in a fiduciary capacity." Most of the remainder of this opinion focuses on factual and legal issues bearing on the scope and nature of the violations of Massachusetts Disciplinary Rules and whether any genuine dispute of material fact must be resolved before the outcome of this Adversary Proceeding is determined.

**C. *The Law Governing Lawyers***

In a current project, the American Law Institute is developing a *Restatement of the Law: The Law Governing Lawyers.* Though not yet advanced far enough that any of the documents thus far released represents the position of the Institute, the drafts are nevertheless a valuable source of guidance in relation to issues for which this court has no authoritative directions exactly on point from any source.

One of the sections drafted for consideration states requirements for informed consent to a conflict of interest.

**§ 202. Client Consent to a Conflict of Interest**

**(1) A lawyer may represent a client notwithstanding a conflict of interest prohibited by 5 201 if each affected client or former client gives informed consent to the lawyer's representation. Informed consent requires that the client or former client have reasonably adequate information about the material risks of such representation to that client or former client.**

**(2) Notwithstanding the informed consent of each affected client or former client, a lawyer may not represent a client if:**

**(a) the representation is prohibited by law;**

**(b) one client will assert a claim against the other in the same litigation; or**

**(c) in the circumstances, it is not reasonably likely that the lawyer will be able to provide adequate representation to one or more of the clients.**

American Law Institute, *Restatement of the Law: The Law Governing Lawyers,* Proposed Final Draft No. 1 § 202 (March 29, 1996).

Comment c(i) of this draft adds:

The lawyer is responsible for assuring that each client has the necessary information. A lawyer who does not personally inform the client assumes the risk that the client is inadequately informed and that the consent is invalid. A lawyer's failure to inform the clients might also bear on the motives and good faith of the lawyer. On the other hand, clients differ as to their sophistication and experience, and situations differ in terms of their complexity and the subtlety of the conflicts presented. The requirements of this Section are satisfied if the client already knows the necessary information or learns it from other sources. A client independently represented—for example by inside legal counsel or by other outside counsel—will need less information about the consequences of a conflict but nevertheless may have need of information adequate to reveal its scope and severity. When several lawyers rep-

resent the same client, responsibility to make disclosure and obtain informed consent may be delegated to one or more of the lawyers who appears reasonably capable of providing adequate information.

*Id.,* § 202, comment c(i).

Draft § 202(2) declares that "a lawyer may not represent *a client* if" the conditions described in (a)-(c) exist. It is possible, of course, that those conditions might exist, in relation to every person the lawyer might represent in a particular set of circumstances. Thus, this draft section recognizes that a conflict or set of conflicts of interest of which the lawyer is aware may be so severe that the lawyer may not represent any of the persons and entities whose conflicting interests are likely to be affected by a prospective transaction.

▪ Also, the second sentence of draft § 202(1) "requires that the client or former client have reasonably adequate information" to give "informed consent to the lawyer's representation." Thus, a conflict or set of conflicts may be so severe that the lawyer must make disclosures to each of several persons or entities (or at least some among the persons or entities) with whom he currently has, or in the past has had an attorney-client relationship. Moreover, it is a reasonable inference, by analogy, that if the lawyer is currently aware of a likely prospect that another person or entity will ask him to accept an attorney-client relationship, the lawyer must make disclosures to that person or entity also.

▪ The scope of the duty of disclosure or a duty to avoid material misrepresentation depends on particular facts and circumstances that may be distinctive to the entire course of events and relationships of the attorney with various persons and entities, over a period of time. The ALI Draft makes this point explicitly as to a client in saying:

> A client independently represented—for example by inside legal counsel or by other outside counsel—will need less information about the consequences of a conflict *but nevertheless may have need of information adequate to reveal its scope and severity*
>
> . . . .

American Law Institute, *Restatement of the Law: The Law Governing Lawyers,* Proposed Final Draft No. 1 § 202, comment c(i) (March 29, 1996) (emphasis added). The point has greater force if the person is not *independently represented.*

▪ Also, although the duty of disclosure stated in comment (c)(i) refers to the duty *to a client,* the duty may extend to others. A lawyer cannot entirely escape a duty of disclosure by declining to enter into a current attorney-client relationship with the potentially affected person or entity in circumstances in which a duty of disclosure is founded on past attorney-client relationships. A lawyer is prohibited from making a false statement of material fact, even to a non-client. The most recent ALI draft proposes the following language on this subject:

> **§ 157. Statements to Non–Client**
>
> **A lawyer communicating on behalf of a client with a non-client may not:**
>
> **(1) knowingly make a false statement of material fact or law to the non-client,**
>
> **(2) make other statements prohibited by law; or**
>
> **(3) fail to make a disclosure of information required by law.**

American Law Institute, *Restatement of the Law: The Law Governing Lawyers,* Tentative Draft No. 8 § 157 (March 21, 1997).

A duty may exist, also, to inform a non-client of a conflict. This is a point as to which sources of authority fall short of providing an explicit mandate but nevertheless do provide guidance by analogy. At the least, they provide an analogy supporting the view that a lawyer whose past relationships (with parties and entities affected) included fiduciary relationships other than attorney-client relationships (past, present, or prospective) must take these relationships into account also in determining what disclosures, and to whom, are needed to "reveal" the "scope and severity" of conflicts.

### D. The Bearing of Conflict of Interests on Defalcations

As noted above, sources of authority lack precise answers for questions about the *scope*

*of the duty of disclosure* of a lawyer who has had multiple fiduciary relationships, including lawyer-client relationships. And, although several courts have considered the impact that a rule of professional responsibility may have on whether a debt is dischargeable under § 523(a), those courts were not faced, in the cases before them, with a conflict of interest like that currently before this court.

Probably the case that is closest to being factually like the case currently before this court is *In re Garver,* 180 B.R. 181 (Bankr. N.D.Ohio 1995). Garver was an attorney who acted as counsel for a company called REA. *Id.* at 183–84. While representing REA, Garver proposed a joint venture under which he and REA would become partners to acquire a corporation. *Id.* The terms of the acquisition required each (of REA and Garver) to transfer $600,000 to a company called Fostoria. That company was owned in part, and controlled by, Garver. *Id.* Garver never transferred his $600,000. *Id.* A court awarded REA $600,000 in damages for malpractice and breach of contract. *Id.* Garver filed for bankruptcy, and REA sought a ruling that the debt Garver owed to REA was non-dischargeable under § 523(a)(4). *Id.*

The court determined that the debt was non-dischargeable. *Id.* at 186. This conclusion rested, in part, on examination of the Ohio disciplinary rule that requires a lawyer to refuse employment when his or her interests may impair his or her independent judgment. *Id* at 185. The court noted that certain relationships, including the attorney-client relationship, will usually result in the finding of a trust. *Id.* (citing *Kwiat v. Doucette,* 81 B.R. 184 (D.Mass.1987)). The court held that the attorney-client relationship was sufficient, in these circumstances, to create a technical trust in favor of REA and that the attorney's violation of the rules of professional responsibility had an impact on whether he had committed a defalcation. *Id.*

Several other courts have similarly considered the impact that various rule of professional responsibility have on the dischargeability of a debt in bankruptcy, with differing results. *See e.g., In re Young,* 91 F.3d 1367 (10th Cir.1996) (no fiduciary relationship arises from the rule of professional responsibility that requires lawyers to disclose their fees up front); *In re Mason,* 191 B.R. 50 (Bankr.S.D.N.Y.1996) (no fiduciary relationship arises from the rule of professional responsibility that requires that lawyers not neglect a legal matter entrusted to them); *but see Matter of Sonnier,* 157 B.R. 976 (E.D.La.1993) (fiduciary relationship arises from rules of professional responsibility that require lawyers to disclose aggregate settlements when representing multiple clients and to report receipt of settlement monies promptly); *Matter of Charfoos,* 183 B.R. 131 (Bankr.E.D.Mich.1994) (fiduciary relationship arises from rule of professional responsibility that requires lawyer to decline to accept employment if the lawyer's judgment may be affected by the lawyer's own personal or financial interests)

Although numerous courts have considered the impact a rule of professional responsibility can have on the scope of application of § 523(a)(4), no precedent addresses the precise issues of this proceeding. This lack of precedent directly *on point,* however, weighs neither in favor of the accused Attorney Pierce nor in favor of his accusers. Lack of precedent on point demonstrates simply an unanswered but potentially very material question of law.

By itself, the fact that no answer is provided in existing precedent does not even tell us that one or the other of the disputing parties before the court should have a burden of proof on genuinely disputed factual issues, if any are material, or a "burden" of some kind on the unsettled legal issues. These matters of "burdens" are revisited in later parts of this opinion, after additional explanation of distinctive circumstances of this case bearing upon the scope and severity of the conflict of interests.

## VI. More on P & M

### A. *Basic Facts and Law Applicable to the P & M Stock Redemption Agreement*

#### 1. *The Law Regarding Meaning of Contractual Documents*

The documents that, taken together, established the contractual arrangements regarding transfer of P & M stock upon the death

of any one of the only four stockholders of P & M (all of whom were "key persons" as that phrase has been commonly used in relation to agreements varied in detail but nevertheless of this general kind), included the P & M Stock Redemption Agreement and several insurance policies, and perhaps other documents that have not been made a part of the record in this case, either because they have been destroyed or lost or because no party having access to them has chosen to offer them in evidence during proceedings in the Bankruptcy Court.

What rules of law guide the Bankruptcy Court and, on appeal, this and higher courts, with respect to deciding any disputes about the meaning of this entire set of contractual documents? Before turning to the more specialized bodies of law that may bear upon the answer to this question, I take note of First Circuit precedents of more general scope by which both the Bankruptcy Court and this court are guided.

A very recent case, citing and drawing from several other decisions of the last decade, is *Fireman's Fund Ins. Co. v. American Int'l Ins. Co. of Puerto Rico, Inc.*, 109 F.3d 41 (1st Cir. 1997). The court stated:

> Our review of the district court's grant of summary judgment in [defendant's] favor is *de novo. Velez–Gomez v. SMA Life Assur. Co.*, 8 F.3d 873, 875 (1st Cir.1993). Since the construction of an insurance policy is a question of law, we must make our own independent examination of the policy. *Nieves v. Intercontinental Life Ins. Co. of Puerto Rico*, 964 F.2d 60, 63 (1st Cir.1992).
>
> Our analysis of the issue is potentially two-pronged: we consider first whether the loss was the type covered by or contemplated by the policies in question; and if so, we must determine which policy is primary. *See Couch on Insurance 2d*, sec. 62: 44, 45 (Rev. ed.1983).
>
> In addressing the first question, we turn to the language of the policy, supplementing this if necessary with evidence of the parties' intent, as demonstrated here in the Shareholders Agreement, the Stevedoring Agreement, and the various affidavits submitted. *See Nieves*, 964 F.2d at 63 (if wording of contract is explicit and language is clear, terms and conditions are binding on parties); *U.S. Aviation v. Fitchburg–Leominster Flying Club*, 42 F.3d 84, 86 (1st Cir.1994) (determination of ambiguity of policy terms and resolution thereof are matters for the court).

*Id.*, 109 F.3d at 43 (footnotes omitted) In a footnote, the court adds:

> In our analysis, we are mindful that the terms in an insurance contract are to be given their plain meaning. *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1084 (1st Cir.1990).

*Id.* at 44 n. 5.

### 2. *Law Regarding Key–Person Insurance*

P & M was a corporation engaged in the business of lending money secured by mortgages. In 1987 the four stockholders of P & M (Pierce, Herman, Matthew Fisher, and Harvey Madoff) executed a Stock Redemption Agreement. The Stock Redemption Agreement provided that upon the death of a shareholder, P & M would purchase that shareholder's stock.

A sensible starting point for thinking about the issues in this case is that the Stock Redemption Agreement provided that P & M would arrange for the financing of a stock purchase at the death of any of the four stockholders, all of whom were key persons in the corporate affairs, by arranging for the issuance of four life insurance policies—one on the life of each of the shareholders. This is, and was long before the 1987 Stock Redemption Agreement at issue in this case, a well-known form of insurance, commonly called **key-person insurance.**

> It frequently happens that, instead of creating a partnership, several persons owning the entire interest in a business will form a close corporation, holding all the stock themselves. In such event, a contract can be worked out to provide for the purchase of the interest of one of such persons upon his death, the proceeds of insurance being paid to his widow or to his estate.

2 Appleman, *Insurance Law and Practice* 394, § 872 (1966).

■ Moreover, when interpreting documents executed to effectuate a particular agreement among key persons and an insurance company, a court must be sensitive to the point that, absent some statutory provision, administrative regulation, or judicial precedent overriding the law's ordinary respect for freedom of contract, the parties may agree upon whatever disposition of the insurance proceeds they wish, in lieu of having proceeds paid to the surviving spouse or the estate of the decedent stockholder. One of the alternatives the parties might agree upon is payment to a trust designated by the stockholder.

It is the contracting parties (not the court) who, by their bargained-for exchange and assent, create the law in their agreement.

2 *Appleman on Insurance 2d* 3–4, § 5.1 (Holmes & Rhodes ed.1996).

This introductory volume of *Appleman 2d* does not cite cases that are directly on point for our purposes. The new editors of *Appleman 2d* have explicitly and deliberately left for development in later volumes, which are expected to replace those of the earlier edition of *Appleman,* the illustration in special contexts of basic principles stated in the introductory volumes of *Appleman 2d.* The applicability of the general proposition of insurance contract law, stated above, to key-person insurance is confirmed, however, by an examination of cases cited in the most recent pocket part to § 872, cited above. *See. e.g., Anthony v. Perose,* 455 Pa. 233, 312 A.2d 360 (1973) (enforcing agreement as construed consistently with manifested intent of parties) *Cf.* 2 Appleman *Insurance Law and Practice* § 871 and pocket part, applying the same proposition to a partnership arrangement for key-person insurance on the life of a partner, and citing *Hartsock v. Strong,* 21 Md.App. 110, 318 A.2d 237 (1974).

### 3. *Basic Facts of P & M's Key–Person Insurance*

■ The parties to the present case stipulated before the first trial in the Bankruptcy Court that Pierce "drafted and caused [the Stock Redemption Agreement] to be executed." In view of the widely marketed concept of key-person insurance as a means of financing stock-purchase agreements, it is reasonable to infer, absent evidence to the contrary, that the Stock Redemption Agreement drafted by Pierce was meant by the parties who signed it, based on their mutual manifestations to each other in the terms of the document itself, to have significant characteristics in common with key-person insurance then widely marketed.

Some comments in the briefs and oral arguments, and in the Memorandum of Decision on Remand, may be understood as suggesting that Pierce, as drafter, knew best the intent of the parties to the agreement he drafted for them, and that the Bankruptcy Court and higher courts should give deference to his view of the matter. If he did know more, however, that weighs against rather than in favor of Pierce in this Adversary Proceeding. If he knew more than anyone to whom he owed a duty of disclosure, his failure to disclose was a breach of duty.

■ Moreover, privately held and uncommunicated intent of any party is not controlling on other parties. Mutually manifested intent controls. Thus, any *privately held intent* by Pierce that the agreement would give him greater discretion (either acting as attorney for any client, or acting as officer or director of P & M, or acting as an interested individual) to use the insurance proceeds to favor P & M or himself (over other parties to the Stock Redemption Agreement, or their successors in interest) than the arrangements made in association with commonly marketed key-person insurance would not be recognized under applicable law as a modification of the terms of the enforceable contract among the parties to it. Any contention by Pierce to the contrary would be directly contrary to the principles stated in *Appleman 2d,* quoted above, and precedents supporting the application of those principles in analogous contexts.

Quite apart from the special constraints upon Pierce by reason of conflict of interests, discussed in Parts IV and V above, the foregoing conclusion is supported also by Massachusetts and First Circuit precedents regarding interpretation and enforcement of

contracts generally in accordance with mutually manifested meaning. *See, e.g., Donoghue v. IBC/USA,* 70 F.3d 206, 212 (1st Cir. 1995); *Rose–Derry Corp. v. Proctor & Schwartz, Inc.,* 288 Mass. 332, 193 N.E. 50, 52 (1934).

At the time of Herman's death, the four stockholders of P & M were Herman, as trustee of the JFT, Pierce, Fisher, and Madoff. Up to the time of his death, Herman held his share of P & M stock in trust for JFT. Under the repurchase terms of the Stock Redemption Agreement, the price to be paid by P & M for the stock was $400,000. The parties have stipulated that the purchase price of the stock held by Herman Jacobs on his death was $400,000.

■ Some of the language of the Stock Redemption Agreement might be read as saying, literally, that *after a stockholder's death* P & M would *buy back* that shareholder's stock from *the stockholder himself.* But a buy-back from the stockholder himself, *after* his death, is a legal impossibility. By operation of law, or by will or other instrument executed by him before death, upon the death of the stockholder (Herman Jacobs) his ownership passed to another person or entity. Here, it was an entity, the JFT. This court so rules as a matter of law. Thus, the transaction for which the Stock Redemption Agreement provided could not literally be a "buy-back" in which P & M was providing bargained-for consideration to the Estate of Herman Jacobs.

The manifested core purpose of the Stock Redemption Agreement was to deliver *insurance proceeds to the person or entity from whom or which the stock was being transferred to P & M.* That person or entity might be the estate of the just-deceased stockholder, or the person or entity to whom ownership of the stock passed by operation of law, or under the terms of a will, or through any other legally effective arrangement such as a trust. The provisions of the Stock Redemption Agreement simply will not bear the construction that the person or entity entitled to the insurance proceeds would be P & M. This court so rules as a matter of law.

If the Memorandum of Decision on Remand, at 27–32, might be interpreted as making any findings of fact or stating any conclusions of law inconsistent with this ruling as a matter of law, this court vacates those findings and conclusions, to the extent of that inconsistency, and rules as a matter of law that the meaning of the Stock Redemption Agreement in relation to this narrow and precise question is as stated in the two paragraphs immediately preceding this paragraph.

## B. *More of the Course of Events*

### *Transfers of the P & M Stock of Herman Jacobs and the Insurance Proceeds Payable Upon the Death of Herman Jacobs*

■ Before his death, Herman Jacobs had assigned his shares of stock in P & M to the JFT; the JFT owned these shares when Herman died. Thus, the JFT was required by the Stock Redemption Agreement to transfer these shares to P & M and was entitled to receive $400,000 in return for that transfer, not merely as an unsecured debt of P & M, but in cash from the insurance proceeds.

We need not pause to evaluate esoteric theories of lien or constructive trust. The right to cash, forthwith, was a straightforward contractual right, whether specifically enforceable or not. No other reinforcing or alternative theory is needed to establish the *right* of the JFT and the *obligations* of P & M and Pierce, as distinguished from the *remedies* available for breach of contract in violation of that contractual right.

In the June 1994 opinion, this court made some rulings on this subject.

P & M received $405,216 in proceeds from life insurance on Herman, in the form of two checks in roughly equal amounts, on March 23, 1988, and June 10, 1988.

173 B.R. at 23. Thus, the sum of these amounts, apparently including some interest, was more than sufficient to enable P & M to pay over the sum of $400,000 in cash to JFT rather than diverting the insurance proceeds to other purposes and delivering to JFT only a promise to pay—a "debt" of P & M as the Bankruptcy Court characterized it.

The Stock [Redemption] Agreement stated that "[i]n the event the insurance proceeds exceed the purchase price, such excess shall be retained by the Corporation."

*Id.* at 23 [bracketed word added]. Thus, any amount above $400,000 was in excess of the sum agreed to be delivered over to JFT in cash, absent a claim by JFT or JFT beneficiaries for interest. Lewis and Stuart Jacobs have explicitly waived any claim for interest on this basis, and now claim that Pierce's defalcation created an obligation as of that date of exactly $400,000.

In view of these rulings of this court and the waiver of claim above $400,000, it may be unnecessary to decide whether later acts of Pierce, in the role of an officer and director of P & M, were additional defalcations, adding force to the claims that Pierce committed a "defalcation in a fiduciary capacity."

Nevertheless, a summary of later acts of Pierce is recited here for completeness. It is followed by further consideration of the potential bearing of all of Pierce's course of conduct on the defalcation issues.

On April 15, 1988, P & M issued checks to the Internal Revenue Service in the amount of $100,000, and to the Commonwealth of Massachusetts in the amount of $18,750, both bearing memo notations "Estate of Herman Jacobs."

On April 19, 1988, Pierce, as temporary executor of the estate, acknowledged a loan from P & M in the amount of $119,000 bearing interest of 1% per month.

On August 29, 1988, P & M issued two checks, totaling $400,000 to "David Jacobs Trustee of the Jacobs Family Trust and to the Estate of Herman Jacobs." The checks were marked "[f]or deposit only P & M Associates, Inc. 390–018–5 Payment in full settlement for capital stock in Company," and were endorsed by David as trustee of JFT and by Pierce as executor of the estate.

P & M issued a $300,000 subordinated P & M debenture to the QTIP trust at this time.

Exhibit 24. (Apparently, $100,000 was deducted for the $119,000 loan; the discrep-

ancy between the two figures is not explained.)

*Id.,* 173 B.R. at 22–23.

On March 8, 1988, two weeks after Herman's death, David Jacobs, as successor trustee of the JFT, purported to assign the Trust's 125 shares of P & M stock to P & M. At this point, P & M owed the JFT $400,000.00.

More details regarding later events are added in the statement of "FACTS" in the Bankruptcy Court's Memorandum of Decision on Remand.

On various dates between March 22 and 30, 1988, Lewis, Stuart, Kathryn, and David Jacobs, as Trustee of the JFT, executed the agreement terminating the JFT and assigning its assets to the QTIP Trust. Pierce drafted the Termination Agreement. The agreement recited that the signatories were terminating the JFT because, before he died, Herman had expressed intent to terminate the JFT and had stated from time to time that it should be terminated. Before submitting this agreement to Lewis and Stuart for their signatures, Pierce had not provided them with copies of previous drafts of the agreement or with copies of the Stock [Redemption] Agreement, the QTIP, the JFT, the HJFT, or the will. But Pierce did give them an opportunity to read the agreement just before signing it. Deposition of Lewis Jacobs, p. 94; Deposition of Stuart Jacobs, pp. 63–64.

Then, on April 15, 1988, P & M issued two checks, apparently on behalf of Herman's estate: one to the IRS for $100,000.00, and another to the Commonwealth of Massachusetts for $18,750.00. Both bear memo notations "Estate of Herman Jacobs"; both are signed by Pierce; and, on both checks, the word "executor" is inscribed under the signature line. These payments were to cover the income tax payments due that day from Herman and Kathryn. Four days later, Pierce, as temporary executor of Herman's estate, executed a promissory note acknowledging a loan to the estate from P & M in the amount of $119,000.00, with interest at one percent per month, payable upon demand.

The note was given in consideration of the funds advanced by P & M to the taxing authorities on behalf of the estate.

By the end of June, 1988, P & M had received proceeds totalling $405,216.00 from the life insurance it maintained on the life of Herman, to fund the buy-back of stock from the JFT. On August 29, 1988, P & M issued two checks totalling $400,-000.00 to "David Jacobs, Trustee of the Jacobs Family Trust and to the Estate of Herman Jacobs." On the reverse, each check was first endorsed "For Deposit Only/P & M Associates, Inc./390–018–5/Payment in full settlement for capital stock in Company"; and, beneath this first endorsement, each was endorsed by David Jacobs as trustee of the JFT and then by Pierce as executor of the estate. On the same day, P & M issued to Pierce and Kathryn, as trustees of the QTIP Trust, a subordinated debenture in the amount of $300,000.00, payable August 29, 1991, with interest at 12 percent per annum, payable quarterly. The debenture is signed by Harvey Madoff, as president, and Pierce, as treasurer.

As executor of the estate, Pierce never funded the HJFT. Consequently, as trustee of the HJFT, Pierce has made no distribution from the HJFT to the Plaintiffs, its beneficiaries. However, as executor, Pierce has distributed $66,385.33 directly to each of the Plaintiffs. (These appear to be distributions that should have been paid to the HJFT under Article XII of the will and which Pierce, as trustee of the HJFT, would then have been obligated to distribute to the Plaintiffs; Pierce merely collapsed the two steps into one.)

Kathryn Jacobs remarried on December 8, 1990.

*Id.* at 7–9 (footnotes omitted, bracketed word inserted)

The Bankruptcy Court made no findings about what the checks from the insurance company stated in the space identifying the payee or payees, or what endorsements were made on the checks. Nor have the parties called to this court's attention any exhibit or testimonial evidence on this subject.

## C. *Determinations by the Bankruptcy Court on Remand*

### 1. *The Bankruptcy Court's Interpretation of the Stock Redemption Agreement and Its Ruling Regarding Pierce's Defalcation*

The Memorandum of Decision on Remand states:

> Upon assignment of the stock to P & M, and pursuant to the P & M Stockholders Agreement, P & M owed the JFT $400,-000.00.

*Id.* at 7.

This determination by the Bankruptcy Court on remand is vacated for the reasons stated here.

First. To the extent that this determination of the Bankruptcy Court might be regarded as a finding of fact, it appears to be based on the Bankruptcy Court's interpretation of provisions of the Stock Redemption Agreement, which this court has decided, as matters of law are decided, has a manifested meaning different from that stated by the Bankruptcy Court.

Second. To the extent that this determination of the Bankruptcy Court might be regarded as a ruling of law, it is inconsistent with rulings this court made in the June 1994 opinion and with rulings made in the present opinion.

Third. This third point is *central to the outcome* of this proceeding and is, at least potentially, *decisive of the outcome* in this Adversary Proceeding, whether or not the first two points above are accepted by a higher court as correct rulings of this court. If the Stock Redemption Agreement were interpreted as authorizing the transfer of the stock in return for a declared debt of P & M rather than delivery of $400,000 in cash simultaneously with and as a precondition of return of the stock to P & M and acceptance of the stock by P & M, then attorney Pierce's preparation of the Stock Redemption Agreement itself was, as a matter of law, in view of undisputed facts with respect to his representation of Herman Jacobs at that time, a violation of his legally enforceable obligations. This action by Pierce would be a

violation of Pierce's duty not only to Herman Jacobs but also to the sons, Lewis and Stuart Jacobs, as intended third-party beneficiaries of the contract that Herman Jacobs, in the Stock Redemption Agreement, was making with the other stockholders including Pierce himself.

This was a defalcation by Pierce, which is established as a matter of law whether or not Pierce also had at that moment either an attorney-client relationship with Lewis or Stuart or both, as well as with Herman Jacobs. If Pierce did not explain to Herman Jacobs the conflict between Pierce's own personal interest and the interests of Herman and each of his intended third-party beneficiaries, including Lewis and Stuart, the defalcation is substantially more serious. Moreover, his personal interest in conflict with those of Herman, Lewis, and Stuart respectively, was so severe that he could not properly engage in a transaction with Herman giving Pierce himself the discretion to substitute something less than an immediate cash payment to the JFT (a discretion to substitute that the Bankruptcy Court's determination improperly allows).

### 2. *The Bankruptcy Court's Interpretation, on Remand, of This Court's June 1994 Opinion*

The Bankruptcy Court, on remand, incorrectly interpreted this court's June 1994 opinion as precluding any claim by Lewis and Stuart Jacobs in this Adversary Proceeding other than the two described by the Bankruptcy Court in the following way:

> The first is that Pierce wrongfully induced Lewis and Stuart to agree to termination of the JFT; had the funds gone to the JFT, they would have gone entirely to its beneficiaries, Stuart and Lewis, instead of to the QTIP Trust, under which Stuart and Lewis have only a remainder interest in half the funds remaining, if any, upon Katherine's [sic] death. The second is that Pierce committed a defalcation in his capacity as executor by failing to fund the HJFT (of which Stuart and Lewis were the sole beneficiaries) before funding the QTIP Trust, as the will required.

*Id.* at 13–14. Final disposition for claimants might be based on the first of these claims,

or on the theory that these claimants were third-party beneficiaries entitled to recover on the second theory. But this court did not have before it on the first appeal any need to rule, and it did not rule, that Lewis and Stuart Jacobs are somehow procedurally or substantively precluded in this case from making other claims as well.

The Bankruptcy Court on remand also misunderstood this court's June 1994 opinion in other respects. One misunderstanding is stated in footnote 8 of that court's Memorandum of Decision on Remand.

> In identifying and addressing these issues, the District Court apparently assumed that, after termination of the JFT, the right to payment under the stock agreement [that is, the Stock Redemption Agreement] either passed to or should have passed to Herman's estate, and that the debenture (which was given in satisfaction of such right to payment) went to the QTIP Trust by virtue of the residuary clause in the will. The District Court opinion makes no mention of the provision in the Termination Agreement pursuant to which the assets of the JFT were to be transferred directly to the QTIP Trust, not to the estate.

*Id.* at 15, n. 8 (bracketed material inserted).

First. This court held that it was entirely appropriate for the Bankruptcy Court in this case, in its decision before the first appeal to this court,

> to treat the question whether P & M owed the $400,000 to the estate or instead to the JFT as a question of law .... the joint pretrial statement did not bind the bankruptcy court on questions of law.

173 B.R. at 26.

Then followed, in the June 1994 opinion, this court's unqualified statement, contrary to the Bankruptcy Court's later interpretation in footnote 8 about what this court "apparently assumed."

> Reviewing the Stock [Redemption] Agreement *de novo*, I conclude that the bankruptcy court erred in holding that the

JFT was not entitled to payment of the $400,000.

*Id.* (bracketed word inserted).

Again, this court now reconfirms, on the basis of the enlarged record now before the court in this second appeal, that, as a matter of law, the JFT was entitled to payment of the $400,000 and to payment in cash upon and simultaneously with delivery of the stock, rather than delivery merely of a promise of P & M to pay in lieu of payment in cash.

## VII. Conclusions

Part IV of this opinion explains that, even before reaching issues regarding the "Law Governing Lawyers," I have concluded that the debtor's defalcations were of a nature and severity constituting a "defalcation in a fiduciary capacity."

Nevertheless, in the interest of avoiding needless delay in final disposition in the event a higher court concludes that this decision is erroneous, I have proceeded to consider whether sources of authority with respect to a lawyer's conduct in the face of conflicting interests presented by this record would independently, provide a basis for final disposition.

One conclusion is that no precedents dare directly on point. At least in part, however, the reasons is that no reported case has presented to a court a set of circumstances in which an attorney has acted in the face of multiple conflicting interests of a scope and severity even approaching those presented by undisputed circumstances of record here.

A second conclusion is that analogies from precedents in other contexts provide a compelling array of support for final judgment for claimants against Pierce in this Adversary Proceeding.

On these two independent grounds, this court decides, as matters of law are decided, that the conduct of Robert Pierce was a "defalcation in a fiduciary capacity" and the debt of $400,000 to claimants Lewis D. Jacobs and Stuart Jacobs is nondischargeable under 11 U.S.C. § 523(a)(4).

Before ordering the Clerk to enter on a separate document a Final Order in this bankruptcy appeal, the court will hear the parties regarding their positions as to what the precise terms of the Final Order should be, given the rulings recited in this opinion. The hearing is scheduled to commence at *2:15 p.m., May 8, 1997.*